DICKENS *et ux. v.* ST. PAUL FIRE & MARINE INS. CO.

(*Nashville,* December Term, 1935.)

Opinion filed July 3, 1936.

SEAY, STOCKELL & EDWARDS, of Nashville, and GARNER, O'BRIEN & RICHARD, of Springfield, for plaintiffs.

AUST, McGUGIN & SPEARS, of Nashville, for defendant.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This is a bill in equity to reform a fire insurance policy so as to include the wife with the husband in the descrip-

tion or designation of the assured, and to recover for a loss by fire of the building described therein, located on land owned by the husband and wife as tenants by the entirety. The chancellor granted the relief under the special facts appearing. His decree was reversed by the Court of Appeals. This court granted *certiorari* and has heard argument.

The facts are clearly and fully stated by the chancellor. We quote from his opinion as follows:

"(1) Complainants, Oscar Dickens and wife, Marie Dickens, are tenants by the entirety of certain real estate near Ridgetop in Davidson County, Tennessee, upon which was formerly located a one-story dwelling. They were also the owners of certain household effects and furniture located on said premises.

"(2) In October, 1934, the complainant, Oscar Dickens, was desirous of obtaining a policy of fire insurance on the dwelling and household effects and furniture and knowing no insurance agent in Davidson County, Tennessee, he spoke to Mr. W. B. Barnes, his grocer at Nashville, Tennessee, and Mr. Barnes told Mr. Dickens that if he would leave his address with him, he would turn it over to Mr. Greener, the agent of the defendant, Saint Paul Fire and Marine Insurance Company, and let Mr. Greener in turn get in touch with Mr. Dickens concerning the fire insurance.

"(3) Mr. Dickens told Mr. Barnes that he thought that the place would carry between One Thousand ($1000.00) Dollars and Fifteen Hundred ($1500.00) Dollars of fire insurance. Mr. Barnes afterwards got in touch with Mr. Greener, the defendant's agent, and told Mr. Greener where to make inquiry at Ridgetop to locate Mr. Dickens.

"(4) Mr. Greener did not interview either Mr. Dickens or his wife, Marie Dickens, but left a policy of fire insurance with Mr. Barnes, issued by the Saint Paul Fire and Marine Insurance Company, Policy No. 70048, in the sum of One Thousand ($1,000.00) Dollars, insuring Oscar Dickens for the term of one year from the 25th day of October, 1933, at noon, to the 25th day of October, 1934, at noon, against all direct loss or damage by fire, subject to certain exceptions unnecessary to mention, in an amount not exceeding One Thousand ($1000.00) Dollars, of which Seven Hundred ($700.00) Dollars was on the dwelling and Three Hundred ($300.00) Dollars on the household and personal effects.

"(5) The dwelling was owned by the complainants, Oscar Dickens and Marie Dickens, as tenants by the entirety and the improvements thereon were worth between Thirteen Hundred ($1300.00) Dollars and Fifteen Hundred ($1500.00) Dollars. The household and personal effects were owned in part by Mr. Dickens and in part by Mrs. Dickens and were worth considerably more than Three Hundred ($300.00) Dollars.

"(6) Said policy, among other things, contained the following clause:

"'This entire Policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein, or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.

"'This entire Policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be

void . . . ; . . . if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee simple.'

"(7) In December, 1933, after said policy had been in effect only about two months, said dwelling was completely destroyed by fire, together with all of the furniture and household effects of the complainants therein situated, involving a total loss to the complainants considerably in excess of One Thousand ($1000.00) Dollars.

"(8) The complainants seasonably presented claim for said loss but the same was rejected by the defendant Insurance Company upon two grounds:

"First, that the assured was not the sole and unconditional owner of the property and

"Second, that the policy carried a warranty that the house was built on a solid foundation, whereas, it was constructed on a pier foundation.

"(9) The complainants filed their bill in this case, seeking to have the policy of insurance issued by the defendant Company reformed so that the same will insure Oscar Dickens and wife, Marie Dickens, instead of Oscar Dickens alone against fire thereunder, and seeking to be awarded a judgment on the policy so reformed in the sum of One Thousand ($1000.00) Dollars for the property destroyed by fire, together with interest thereon from the date said loss should have been paid, and seeking to have the defendant held estopped and enjoined from relying upon its defense as to the title of the property insured, or as to the character of the foundation thereof.

"(10) The defendant filed its answer herein, setting up both of the defenses relied upon insofar as the Seven

Hundred ($700.00) Dollars insurance on the dwelling is concerned, but making no point on the insurance coverage of Three Hundred ($300.00) Dollars on the household furniture and effects, and tendered into Court the sum of Nine and Thirty-eight Hundredths ($9.38) Dollars, which the answer alleges to be that portion of the insurance premium represented by the Seven Hundred ($700.00) Dollars coverage on the building.

"(11) Upon the trial of the case, counsel for the defendant, in open court, stated that the defense with respect to the character of the foundation of the building was withdrawn and the same need not be considered but otherwise the defendant relied upon the other defenses set forth in its answer.

"(12) The Court finds as a fact that neither Oscar Dickens nor his wife, Marie Dickens, represented to the defendant Insurance Company that the title to the dwelling sought to be insured in this case was vested alone in Oscar Dickens. Neither of them was interviewed by Mr. Greener or any other representative of the defendant Insurance Company.

"(13) Mr. Greener does not testify in the case nor explain why it was that he made the error of inserting in the policy the name of Oscar Dickens alone, instead of issuing the policy in the name of Oscar Dickens and wife, Marie Dickens, but the Court is warranted in believing that it was the purpose and intent of Mr. Greener, the defendant's agent, to issue a policy on the house that would protect both owners and that would properly describe the owners of the premises.

"(14) Mr. Greener, the defendant's agent, himself, made the error in describing the property as owned by Oscar Dickens instead of as owned by Oscar Dickens and

wife, Marie Dickens, and this error was not the result of misinformation furnished by the complainants to the defendant Company.

"(15) The policy was left by Mr. Greener with Mr. Barnes, with instructions to deliver the same to Mr. Dickens but to collect the premium of Thirteen and Forty Hundredths ($13.40) Dollars thereon before delivery, and Mr. and Mrs. Dickens called on Mr. Barnes for their policy, which was delivered to Mr. Dickens, at which time Mrs. Dickens paid to Mr. Barnes the annual premium, which he transmitted in regular order to Mr. Greener, the defendant company's agent.

"(16) The said premium would not have been paid and said policy would not have been accepted by the complainants except upon their belief that defendant insurance company issued a proper and binding contract of indemnity against fire, insuring their interests in the property. Just how the mistake occurred, the defendant Company has not undertaken to explain but the mistake was mutual and is one against which a court of equity can and should grant relief.

"(17) Oscar Dickens, to whom the policy of insurance was delivered, was an illiterate man who could not have intelligently read and understood the policy and did not know of the mistake the defendant's agent had made therein, and neither he nor his wife knew of said mistake until after the fire, when their attention was called thereto by the defendant Insurance Company."

The Court of Appeals treated our recent case of *Alfred* v. *Bankers' & Shippers' Insurance Co.*, 167 Tenn., 278, 68 S. W. (2d), 941, and the authorities therein cited, as controlling. In the *Alfred Case* the husband was

denied a recovery on a policy issued in his name, when it developed that the title was in husband and wife as tenants by the entirety, and this court said:

"It does not appear that any inquiries were made of the insured as to title and ownership when this policy was issued. The acceptance of the policy, however, under the decisions of this court, containing the provision quoted, amounted to a representation that the title and ownership were as stated. *Foster* v. *Illinois, etc., Ins. Co.,* 156 Tenn., 436, 300 S. W., 7; *Standard Grocery Co.* v. *National Fire Ins. Co.,* 161 Tenn., 640, 32 S. W. (2d), 1023; *Cooley* v. *East & West Ins. Co.* [166 Tenn., 405], 61 S. W. (2d), 656.

"A false representation by a tenant in common or other part owner that he was the sole and unconditional owner of property insured would undoubtedly avoid the policy. *Catron* v. *Tennessee Ins. Co.,* 25 Tenn. (6 Humph.), 176; *Foster* v. *Illinois, etc., Ins. Co., supra;* *Standard Grocery Co.* v. *National Fire Ins. Co., supra.* Such a misrepresentation is clearly material to the risk."

However, in that case, this was also said:

"The insured here comes into court asserting his bare legal rights under this policy. No element of estoppel or special equity is brought out in his favor. Such being the case, we are satisfied that the chancellor's decree was correct." (The Chancellor had denied recovery.)

We think the instant case is to be distinguished from the *Alfred Case.* In the first place, this is primarily a bill in equity, brought by the husband and wife, seeking reformation on equitable grounds and setting up estoppel and waiver. The insured does not come here "asserting his bare legal rights" under this policy.

So far as appears from the opinion in the *Alfred Case,* the customary application for insurance was made and the usual negotiations and personal contacts took place between the insured and the agent of the company, and the insured personally accepted delivery of the policy, and was free from any disability whatever tending to relieve him from the general rule of diligence requiring a reading and inspection of the terms of a contract tendered and received.

Here the circumstances were unusual. The only negotiations were through a third party who selected the agent, who was unknown to the insured. It significantly appears that this insurance agent failed to contact the insured for application or information, despite the request of the insured and the suggestion of the intermediary that he do so, but elected to proceed independently and on his own responsibility. Dickens' testimony on this point reads as follows:

"I didn't know any insurance man in Davidson County, so I went by Mr. Barnes out there to get something and I asked him did he know a good insurance man to send there to write insurance, and he said, 'Yes, I know several insurance men.' And I told him to send me one up there. It went on for maybe two or three weeks and nobody came to see about the insurance. So I went by Mr. Barnes and said, 'You never did send me any insurance man.' And he said he forgot it. And Mr. Barnes said, 'I will send you a man up there right away.' So it went on and nobody never did come, so it was maybe a week or two that I went back down there and Mr. Barnes says 'Those policies are out here.' And he said 'Have you got the money to pay for them?' I won't be positive but I don't think I had the money with me that

day to pay for the policies, but the next time we went over there my wife paid for the policies.''

■■ The majority rule which this court has adopted that the acceptance of the policy amounts to a representation that the title is as therein stated is, of course, subject to exceptions. One of these is that acceptance must be coupled with reasonable opportunity to ascertain the contents of the policy before mere acceptance can amount to a representation of the contents. In the instant case, the inability of the assured to read the policy is plausibly urged as rebutting the assumption that his acceptance of it amounted to a representation that what the insurance company had written into it was true. By analogy, if an accused be deaf and dumb, no presumption of acknowledgment of his participation in a crime arises from his failure to speak when the accusation is made against him in his presence.

And another exception would seem to arise when the agent of the company fails and refuses, although so advised and requested, to interview, or open an opportunity for an interview with the insured in connection with the preparation and delivery of the policy, thus depriving the insured of the opportunity to advise him as to the facts of the title, or to check with the agent and correct discrepancies in the recitals of the policy. Here is an affirmative assumption of the risk of error which tends to shift from the insured the responsibility, and render inapplicable the rule of representation by acceptance.

The agent of the company did not testify and no explanation is offered for his unusual conduct. It is clearly proven that the insured requested Mr. Barnes, his grocer, who communicated for him with Mr. Greener, the agent, who the insured did not know and never saw,

to send an insurance man to see him, and according to Mr. Barnes, left with him directions how the man was to find his house. That complainant Dickens expected a visit from the agent is plain from the testimony of both Mr. Barnes and himself. Instead, the agent elected and assumed to make his own independent investigations and then prepared a policy and left it with Mr. Barnes in an envelope to be delivered to the insured, upon payment of the premium, the only part left to be performed by the insured in the closing up of the transaction. The agent not only assumed to frame the contract with respect to ownership, etc., but as to the amount and its allocation between the building and the furnishings. Can this insured, unable to read the contents of this document, not simple or easily comprehendable by the educated, be fairly held to be within the rule that acceptance amounts to representation of the truth of the contents? We think not.

We have been cited to no authority applying this rule of representation by acceptance of the recitations of a policy, where the insurance company's agent drafting the policy has refused to contact the insured, but elected to act wholly on his independent investigation, and delivered the policy, through a disinterested third party, commissioned only to collect the premium; and where, moreover, the insured is illiterate and incapable of reading for himself the contract. These are special elements which take the case out of the general rule.

In *Catron* v. *Tennessee Ins. Co.*, 6 Humph. (25 Tenn.), 176, the insured contacted and applied directly to the company, held himself out as the owner of the premises, and accepted the policy from the company. And in *Standard Grocery Co.* v. *National Fire Insurance Co.*,

161 Tenn., 640, 643, 32 S. W. (2d), 1023, the contact between the parties was emphasized and the fact that the misinformation was obtained by the agent from the insured.

While the rule does not exact that inquiries be made of the insured as to his title, it must appear that the insured was at least afforded some opportunity to disclose the facts, or to correct a misapprehension and misstatement of them.

■■ Moreover, it will be borne in mind that this is a bill to reform the instrument rendered invalid by mutual mistake. Certainly it will be conceded that the insurance company intended to name as the assured the owners of the property. To assume otherwise would be to impute to the company a willful purpose to defraud. The draftsman for the insurance company then clearly made a mistake. On the other hand, when complainant Dickens sought insurance and received the policy and paid the premium, he expected and understood that it would be so conditioned and expressed as to insure his home from loss by fire. He contemplated that it would recite the facts of ownership and had no thought or intention of misrepresentation, and if given an opportunity to do so would have advised the agents as to the state of the title. The mistake of the agent in his designation of the assured grew out of his failure to contact the assured.

It is well settled that insurance policies, like other written instruments, may be reformed in equity in cases of mutual mistake. *Gleason* v. *Ins. Co.*, 127 Tenn., 8, at page 27, 151 S. W., 1030; 2 Cooley's Briefs on Insurance (2 Ed.), 4416; *Phillips* v. *North River Ins. Co.*, 14 Tenn. App., 356; *Walker* v. *Walker*, 2 Tenn. App., 279;

*Woodfin* v. *Neal,* 16 Tenn. App., 481, 65 S. W. (2d), 212; *Tennessee Valley Iron & R. Co.* v. *Patterson,* 158 Tenn., 429, 14 S. W. (2d), 726, 727. In Crouch Cyc. Insurance, 5011, 5012, sec. 1403, it is said that a policy of insurance may be reformed after loss. And see *New River Lumber Co.* v. *Blue Ridge Lumber Co.,* 146 Tenn., 181, at page 204, 240 S. W., 763, where it is shown that a court of equity may reform an instrument to correct a mistake of law, as well as of fact, so as to express the real contract.

In *Tennessee Valley Iron & R. Co.* v. *Patterson, supra,* CHIEF JUSTICE GREEN, discussing principles governing reformation, quotes with approval from *Grymes* v. *Sanders,* 93 U. S., 55, 23 L. Ed., 798, the statement that "The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved." The supposed case was one in which an obligation had been by mistake assumed. Here we have a case where the mistake was in not assuming an obligation. In the instant case the court should be satisfied that it was by mistake that the policy did not create the obligation to insure, and that, but for this mistake, the company would have assumed it.

■ But if on the theory that the instrument was written as it was intended to be written, and named the party intended to be insured it be conceded that, in strictness, reformation is not justified, nevertheless, we are of opinion that the insurance company is cut off from its attempted repudiation of this obligation by the course of conduct heretofore recited; that it waived its right to rely on the rule of representation by acceptance when its agent failed and refused to contact the insured and

elected to conduct his own investigation, inspections, appraisals, and apportionments and acted thereon. He does not testify, and it must be assumed that he took these steps and obtained his information from some source he was willing to accept as reliable. Indeed, it is said on the brief for the company that "the inference must arise that Mr. Greener went to see the property and wrote $700.00 on the house and only $300.00 on the furniture," in the absence of, and without contacting the owners. Waiver is briefly defined as "the relinquishment or refusal to accept of a right." Bouvier. This terse definition fits the facts like a blanket. Greener, had the right, under the rule of representation by acceptance, to rely altogether on the insured, but he relinquished or refused to accept his right to do so failed to use it, and cannot now be heard to do so, when the conditions have changed so that the insured would be injured thereby.

But if it be said, on the other hand, that the agent did not seek and act on other and independent information, but made no inquiries or investigations, secured no information whatever, and acted on a mere guess, then it may be fairly concluded that he regarded the point now relied on to defeat this claim as immaterial to the risk, and having so treated it thus, the company is estopped to treat it otherwise now. Indeed, that the insurer did not regard this particular title feature as material to the risk under the circumstances of this case, and was willing to waive it, is indicated with much force by the fact that the same policy covered, not only the building owned by the husband and wife, but the furnishings owned in part by both, an exceptional situation the effect of which is not considered in any case cited. It thus affirmatively appears that the wife was con-

sidered an acceptable risk against the contingency of a fire loss directly involved in the risk assumed on the building. The theory of waiver of the fact of the wife's interest in the building thus finds support.

In the absence of any explanation in the record from Mr. Greener, it is permissible to indulge either of these inferences suggested above in explanations of his course, and in either aspect the defense of the company must be rejected.

The decree of the Court of Appeals is reversed, and that of the chancellor affirmed.