# THIRD NAT. CO. et al. v. THOMPSON et al.—191 S. W. (2d) 190.

Middle Section. August 25, 1945.

Petition for Certiorari denied by Supreme Court, December 8, 1945.

Máddin, Bailey & Powell, Albert Williams, and Joe Brown Cummings, all of Nashville, for appellants.

Norman & Keefe, of Nashville, for appellee Thompson.

W. P. Cooper, of Nashville, for appellee Third National Co.

Manier & Crouch, of Nashville, for appellees Dr. Wilkerson and wife.

FELTS, J. The Third National Company, holder of a note secured by a mortgage trust deed on real estate,

and W. L. Haynes, the trustee, brought this suit on three policies of insurance to recover for loss by fire of a house on the premises. The balance due on the note was $3,200 and some interest. The policies totaled $7,000.

The mortgagors, Dr. W. W. Wilkerson, Jr., and wife, had sold the land to John F. Thompson, who had assumed the mortgage. The policies had been issued to Thompson, each with a standard mortgage clause to the Third National Company as mortgagee, some ten months before the fire, which totally destroyed the house. The mortgagors and Thompson were joined as defendants with the three insurance companies.

The insurers defended upon the ground of a misrepresentation or breach of warranty as to the use of the property. They sought to avoid the policies as to both the mortgagee and Thompson and, if liable to the mortgagee, to be subrogated to its rights against the mortgagors and Thompson. The mortgagors asked to be exonerated and to have the debt satisfied by the insurers, Thompson, and the land. Thompson sought to recover the balance on the policies after payment of the debt.

The property was on Stones River several miles from Nashville and outside the area in which the Tennessee Inspection Bureau inspected buildings for fixing fire insurance rates. Dr. Wilkerson had built the house and used it as a summer residence, and had had it insured as "a seasonal dwelling." Thompson bought it in July 1939 and continued the insurance in the same way, the the policies being delivered by the insurance agent, Stutson Smith, to Haynes, the trustee.

In November 1940, shortly before the policies were to expire, the trustee notified Thompson to renew them, as required by the mortgage. Thompson saw another insurance agent, John J. Brady, at the Elks Club and

stated that he wanted to insure his "Camp on Stones River," that he wanted $7,000 insurance and no more, that the expiring policies were held by the Third National Company, and that Brady could get from them the description of the property and the information needed. Brady went to the trustee, was shown the policies, took the data from them, and issued new policies insuring the house as "a seasonal dwelling"; one being the policy of the Pacific National Fire Insurance Company for $2,500, dated November 26, 1940, for three years; another being the policy of the National Fire & Marine Insurance Company for $2,000, dated November 18, 1940, for three years; the third being brokered by Brady to Feigenbaum & Stern, who issued a policy of the American Home Fire Assurance Company for $2,500, dated December 26, 1940, for three years. Brady delivered all of these policies to the trustee, with a standard mortgage clause attached to each, and Thompson never saw any of them.

Sometime before asking Brady to insure the property, Thompson had rented it to the American Legion Band as place of entertainment of Legionnaires, their families and guests by concerts, Bingo games, fish fries, etc. Later he rented it to the "40 & 8" Club of the Legion as a clubhouse for members of the Legion, and they employed a man to stay there and operate the club. The house was being so used at the time of the fire, September 22, 1941.

The chancellor found that while each of the policies stipulated the house was occupied and was to be occupied "only as a seasonal dwelling," it was in fact occupied as a clubhouse by the American Legion Band and later by the "40 & 8" Club; that this was a more hazardous use, required a higher premium, and was a constructive misrepresentation by Thompson; but that later Brady, the agent, himself a Legionnaire, attended two of the

entertainments, and acquired knowledge of the use of the premises as a clubhouse; and that this knowledge of the agent was imputed to his principals, the Pacific National Fire Insurance Company and the National Fire & Marine Insurance Company, but not to the other company, the American Home Fire Assurance Company.

And the chancellor decreed that each of the three companies was liable to the mortgagee under the standard mortgage clause for its pro rata part of the mortgage debt, with interest, and an attorney's fee of $417.67 as penalty for bad faith refusal to pay; that the Pacific National Fire Insurance Company and the National Fire & Marine Insurance Company were also liable to Thompson; that the former pay to the Clerk and Master $2,500, with interest from January 8, 1942, plus $149.60, or five-fourteenths of the attorney's fee; that the latter pay $2,000, with interest from January 8, 1942, plus $119.70, or four-fourteenths of such fee; that the American Home Fire Assurance Company pay $149.60, or five-fourteenths of the fee; and that from these sums the Clerk and Master pay the mortgage debt and attorney's fee and pay the balance to Thompson. The costs were adjudged against the three insurance companies.

All these companies appealed. Their first insistence is that upon his finding of a misrepresentation or breach of warranty, the chancellor should have held that the policies were void ab initio, never took effect, and that no liability could arise or attach under the standard mortgage clause. Counsel quote these provisions, the same in each of the policies:

"This Policy is made and accepted subject to the foregoing stipulations and conditions, and to the following stipulations and conditions printed on back hereof, which are hereby specially referred to and made a part of this

Policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of this Company shall have power to waive any provision or condition of this Policy except such as by the terms of this Policy may be the subject of agreement endorsed hereon or added hereto; . . ."

"This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void if . . . the hazard be increased by any means within the control or knowledge of the insured. . . ."

It is argued that by the first of these provisions the attached rider insuring the house as "occupied and to be occupied only as a seasonal dwelling," was a material part of the contract and the determining factor in fixing the amount of the premium; that the use of the premises as a clubhouse was an increase of the hazard by means within the control and knowledge of the insured; that by the second provision above quoted and because of this misrepresentation increasing the risk, the policies were "void" and the mortgage clause never went into effect; and that this result is emphasized by this provision in each of the policies:

"If, with the consent of this company, an interest under this policy shall exist in favor of a mortgagee or of any person or corporation having an interest in the subject of insurance other than the interest of the insured as described herein, the conditions hereinbefore contained shall apply in the manner expressed in such provisions and conditions of insurance relating to such interest as shall be written upon, attached or appended hereto."

■ We cannot follow this argument. It is not claimed the mortgagee knew of the use of the house; the proof is that it did not; nor is it claimed, nor could it be, that Thompson was guilty of any bad faith. He told Brady to insure his "Camp on Stones River," neither stating nor being asked to state for what the camp was being used. He did say Brady could get the information as to the property from the policies held by the mortgagee; but it does not appear that he ever actually saw or read those policies or knew they described the premises as "occupied and to be occupied only as a seasonal dwelling." And if he had known this, it would hardly have occurred to him as an ordinary man that this made any difference in the hazard or in the premiums. It is only by construction of law that he is chargeable with this as a representation in the policies. Cooley v. East & West Ins. Co., 166 Tenn. 405, 410, 419, 61 S. W. (2d) 656, 658, 661; Alfred v. Bankers' & Shippers' Ins. Co., 167 Tenn. 278, 68 S. W. (2d) 941. Compare: Dickens v. Fire & Marine Ins. Co., 170 Tenn. 403, 95 S. W. (2d) 910; Norvell v. Mutual Benefit Health & Accident Association, 14 Tenn. App. 396.

■ But treated as a misrepresentation and a breach of the above stipulation against an increase of the hazard, it did not make the policies "void" or prevent their taking effect. They were merely voidable if the insurers chose to avoid them. But the insurers could waive the matter and leave the contracts as binding upon themselves as they were upon the insured. Dickens v. Fire & Marine Ins. Co., 170 Tenn. 403, 415, 95 S. W. (2d) 910, 914; Baird v. Fidelity-Phenix Fire Ins. Co., 178 Tenn. 653, 663, 162 S. W. (2d) 384, 388, 140 A. L. R. 1226, 1231; Cooley v. East & West Ins. Co., 166 Tenn. 405, 61 S. W. (2d) 656.

The policies, however, were voidable only as to the insured, not as to the mortgagee. Such is the effect of the mortgage clause. This misrepresentation, or increase of the hazard, was an act of the insured, not participated in or known by the mortgagee. That clause stipulates, among other things, that the insurance as to the interest of the mortgagee "shall not be invalidated by any act or neglect" of the mortgagor or owner of the property insured, nor by the "occupation of the premises for purposes more hazardous than are permitted" by the policy.

It is true that the provision last above quoted, being the old form of the New York Standard Fire Policy which undertakes to make the conditions of the policy apply also to the mortgage clause, is ambiguous and has been held by some courts to control the mortgage clause, to make the mortgagee merely an appointee to receive what would otherwise become payable to the mortgagor, so that the mortgagor's default or breach of a condition of the policy destroys the mortgagee's rights. Vance on Insurance, 2d Ed., 657, 658. But the majority view, and the rule in this state, is that the mortgage clause itself controls and prevails over contrary provisions in the policy. Laurenzi v. Insurance Co., 131 Tenn. 644, 657, 176 S. W. 1022, 1025, Vance, supra.

Since the decision in Laurenzi v. Insurance Co., our statute, Code Section 6175, prescribing the standard form mortgage clause, has been enacted. That statute provides, among other things not here material, that the insurance as to the interest of the mortgagee "shall not be invalidated by an act or neglect of the mortgagor owner of the property so insured . . . nor by occupation of the premises for purposes more hazardous than are permitted by such policy." The rider having been attached to insure the interest of the mortgagee, this

statute became part of the policy so as to override and supersede any contrary provision in it. Johnson Transfer & Freight Lines, Inc. v. Fire Ins. Co., 168 Tenn. 514, 519, 79 S. W. (2d) 587, 589.

■ As stated, each of the attached standard mortgage clauses was substantially in the form prescribed by this statute. It has been settled in this state that this mortgage clause is so far a separate and independent contract between the insurer and the mortgagee that the latter's rights cannot be invalidated by any act or neglect of the mortgagor or insured nor by occupation of the premises for purposes more hazardous, than are permitted by the policy. Phoenix Fire Ins. Co. v. Farmers Ins. Co., 165 Tenn. 337, 54 S. W. (2d) 971. Cf. Phoenix Mut. Life Ins. Co. v. Ætna Ins. Co., 166 Tenn. 126, 59 S. W. (2d) 517. See also: Annotations, 97 A. L. R. 1165, 124 A. L. R. 1034, 1038.

■ The Pacific National Fire Insurance Company and the National Fire & Marine Insurance Company complain of the action of the chancellor in holding them liable to Thompson because their agent Brady had knowledge of the use of the premises. First, it is said that the evidence does not support this finding of the chancellor; that at most it shows only that Brady attended two of the meetings, a spaghetti supper in the spring of 1941 and a floor show in August 1941; that he did not see the paraphernalia for the Bingo games, the nickelodeon, the selling of sandwiches and soft drinks, or anything to show that the property was being used as a clubhouse by the Legion; and that he did not know it was being so used but assumed Thompson had merely loaned the property for those two occasions.

Without reviewing the evidence in detail, we think it supports the chancellor's finding. For some two years

before the loss the American Legion Band and the "40 & 8" Club had been using the property as a clubhouse, having band concerts, meetings, Bingo games, and other entertainments. Members of the Legion had erected signs on the road to the property, mailed out invitations, and given wide publicity to these amusements; and such amusements were a matter of common knowledge among the Legionnaires in Nashville. Mr. Brady was a Legionnaire and attended two of the meetings. On these occasions the furniture and paraphernalia were observable. Moreover, Thompson testified that he told Brady he had rented the property to the American Legion; and that he explained to Brady that he was paying the premiums with his part of the proceeds of the entertainments. Mr. Brady did not deny this; he was merely unable to recall whether there had been such a conversation.

Second, it is argued that it did not bind the insurers even if Brady did acquire knowledge that the premises were being used as a clubhouse. The argument is that the extent of his agency was to issue the policies and settle for the premiums; that he issued them in November 1940 and soon thereafter remitted the premiums without waiting to collect them from Thompson; that when he did this his duties and his agency terminated and any knowledge thereafter acquired by him was not acquired in the course of his agency and would not bind the insurers.

This narrowly limited agency doctrine no longer prevails in this state. Under our statute, Code section 6087, Brady was the agent of these insurers "in all matters" relating to these policies. Maryland Casualty Co. v. McTyier, 150 Tenn. 691, 266 S. W. 767, 48 A. L. R. 1168. In that case, as in this, it was argued that the "agency terminated with the delivery of the policy"; but the court

rejected that insistence and held that knowledge later acquired by the agent as to a change of ownership of the property was within the scope of his agency and binding on the insurer.

In Cooley v. East & West Ins. Co., 166 Tenn. 405, 61 S. W. (2d) 656, an agent issued a $2,000 policy for E Company and a $1,000 policy for R Company, each with the condition that the total insurance should not exceed $6,200. Later he issued a $4,000 policy for A Company, making the total insurance $7,000 and breaching the condition in the first two policies that it should not exceed $6,200. It was held that the knowledge of such breach, acquired by the agent six months after issuing the first policy and four months after issuing the second, was knowledge acquired in the course of his agency for the first two insurers and was imputed to them.

■ Upon the authority of these two cases, we think the knowledge of Brady as to the use of the premises was binding on these two insurers. As to them, he was not a fire insurance broker, but was their general agent with authority not only to receive applications but also to issue policies, conclude binding contracts, collect and remit premiums, and deliver receipts therefor. He learned of the use of the premises as a clubhouse as early as the spring of 1941. With this knowledge of the breach of the stipulations in the policies as to the use of the premises, the insurers remained silent, and their agent Brady went on collecting the premiums from Thompson, for several months before the loss. This, we think, was a waiver of the breach which precluded them from relying on it as a defense. In the Cooley case, supra, Chief Justice Green said:

"If notice of a breach of condition is given to an insurer before loss, good faith requires the insurer, if it intends

to claim a forfeiture, to do so with reasonable promptness and to give the insured an opportunity to protect himself by procuring other insurance. Under such circumstances the insurer ought to speak.'' 166 Tenn. 416, 61 S. W. (2d) 660.

In that case the insurers were held liable because they had remained silent two months and two days after the breach and before the loss. In this case the insurers remained silent for a much longer period. So we think the chancellor properly held them liable to the insured Thompson.

All the insurers assign error upon the allowance of the penalty. We think this assignment must be sustained because the prerequisites of the statute, Code section 6434, for recovery of the penalty had not been met when the suit was brought.

The fire occurred September 22, 1941, and the adjuster for the insurers inspected the premises and asked Thompson to furnish him a break-down statement of the cost of the house. On September 29 Thompson furnished the statement showing the cost to be between $11,000 and $12,000. But formal proof of loss, as required by the policies, was not made until November 8, 1941. On December 27, 1941, the insurers' adjuster returned the proof of loss with the objections, one of which was that it did not show ''in detail how you arrived at the figures of sound value and loss and damage.'' In view of the fact that the house was totally destroyed and the policies, having been written more than ninety days, had become valued policies, Riddick v. Insurance Company, 165 Tenn. 105, 52 S. W. (2d) 166, this objection was purely frivolous, and the others were equally unjustified. Then followed some correspondence between counsel for Thompson and counsel for the insurers. Each of the policies provided:

". . . the sum for which this company is liable pursuant to this policy shall be payable sixty days after due notice, ascertainment, estimate, and satisfactory proof of loss have been received by this company in accordance with the terms of this policy."

While much of this provision had become inapplicable because the policies were valued policies, the provision for proof of loss and for maturing the policies sixty days after such proof remained in effect. So the policies by their terms did not mature until sixty days after November 8, 1941, or January 7, 1942. Under the statute the insurers could wait or delay for sixty days after January 7, 1942, without incurring liability for the penalty. De-Rossett Hat Co. v. Fire Insurance Co., 134 Tenn. 199, 183 S. W. 720; St. Paul Fire & Marine Insurance Co. v. Kirkpatrick, 129 Tenn. 55, 164 S. W. 1186; Thompson v. Interstate Life & Accident Ins. Co., 128 Tenn. 526, 162 S. W. 39.

These cases hold that in order to justify allowance of the penalty, (1) the policy must have by its terms become due and payable, (2) there must then be a demand on the insurer for payment, (3) the insurer must refuse to pay the loss within sixty days, and (4) such refusal must be not in good faith.

In the present suit the insurers did not deny liability or refuse to pay within sixty days. They were merely waiting, as they had a right to do under these decisions, during a period of sixty days. Before that sixty-day period expired this suit was brought, February 3, 1942. So no right to recover the penalty had accrued.

This disposes of all the material questions made by appellants. All of their assignments of error are overruled except the one as to the penalty. The chancellor's decree will be modified so as to disallow the penalty; in

450

all other respects it is affirmed. The cause will be re-manded to the Chancery Court to adjust the equities of the parties. The costs of the appeal are adjudged against the appellant insurance companies.

Howell and Hickerson, JJ., concur.