James CARRINGTON, d/b/a Carrington
Construction Company,
Plaintiff-Appellant,

v.

W. A. SOEFKER & SON, INC.,
Defendant-Appellee.

Court of Appeals of Tennessee,
Western Section, at Jackson.

Sept. 14, 1981.

Application for Permission to Appeal Denied by Supreme Court Oct. 13, 1981.

Joseph M. Cook, Memphis, for plaintiff-appellant.

Carl H. Langschmidt, Jr., W. Stephen Gardner, Memphis, for defendant-appellee.

NEARN, Judge.

Appellant James Carrington, d/b/a Carrington Construction Company, entered into

a contract with appellee, W. A. Soefker & Son, Inc., in which Carrington became a sub-contractor to perform sewer installation work on the Federal Youth Center Project at Memphis. Soefker had contracted with the Federal government to perform a major portion of the underground plumbing and electrical installation on the project. Carrington began working on the project July 16, 1975. On July 28, 1975, Soefker sent a letter to Carrington stating that Soefker considered Carrington to be behind schedule and in breach of contract. Soefker further stated that unless by July 30, at 8:00 a. m., Carrington personally took over supervision of the job and had equipment satisfactory to Soefker on the job site, Soefker would take over the job from Carrington. On August 1, Soefker sent a second letter to Carrington notifying him to cease operations. Although Carrington apparently did some minor work on the project after that time, Soefker completed the major portion of Carrington's contract.

Carrington sued Soefker to recover payment for the work Carrington had performed and for damages Carrington allegedly sustained as a result of Soefker's refusal to allow Carrington to complete the contract.

Soefker counterclaimed against Carrington, alleging that Carrington had breached the contract, thus requiring Soefker to complete the work at a cost in excess of the contract price. In addition, Soefker claimed that under the contract between the parties, Carrington was liable for all of Soefker's costs, expenses and attorney's fees arising out of this litigation. After trial, the Trial Judge, sitting without a jury, dismissed the complaint by Carrington and found in favor of Soefker in the amount of $364.15 for actual damages for breach of contract (the amount in excess of the contract price that it cost Soefker to complete the contract) and $3,802.66 for expenses incurred in the lawsuit.

Carrington contends on appeal that the Trial Judge erred in holding (1) that Carrington, rather than Soefker, had breached the contract and (2) in awarding attorney's fees and expenses to Soefker.

The first issue is essentially a factual dispute as to whether Carrington's performance on the job was sufficiently unsatisfactory by August 1, 1975, to constitute a breach of the contractual provisions calling for performance according to a construction schedule. When reviewing findings of fact by a Trial Court sitting without a jury, this Court proceeds *de novo* upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Rule 13(d) Tennessee Rules of Appellate Procedure. We find the evidence in this case does not preponderate against the holding of the Trial Judge that Carrington breached the contract.

The contract between Carrington and Soefker consisted of two and a half pages of provisions typed on Soefker's purchase order form, standard terms on the reverse side of the purchase order form, and by incorporation in the typed provisions, the same terms, provisions, and specifications that existed between Soefker and the Federal government. Carrington's signature accepting the contract appears on the typed purchase order form. The typed provisions included the following:

The Federal Youth Center project will be scheduled and controlled by use of Graph Schedule which will be updated regularly. This schedule will be on display in the Contractor's office at the job site. All subcontractors are hereby directed to review this schedule with the General Contractor. The subcontractor agrees to perform in accordance with this schedule, and will meet all times shown thereon subject to conditions beyond his control. Shortage of manpower or late delivery dates by his material or equipment suppliers will not be considered conditions beyond the subcontractor's control. The subcontractor or subcontractors failing to meet the schedule agree to reimburse the General Contractor for any and all liqui-

dated damages that may be assessed against and collected from him by The Owner.

The evidence revealed that by July 30, 1975, Carrington had ditched and laid 1,065 feet of pipe but, because of a failure in his equipment, had not completed the installation of any of the pipe by properly backfilling the ditches. Soefker contended that the failure to backfill as the work proceeded put Carrington behind the "Construction Progress and Payment Schedule" on display at the job site and justified Soefker's subsequent actions.

Carrington contends on appeal that, regardless of the construction schedule, Carrington had until September 19, 1975, the last date on the schedule, to perform his work and therefore he was not in breach on August 1, 1975. However, the language of the contract quoted above is clear that the contract contemplated performance according to a schedule and thus a breach could occur prior to the final performance date. For this reason, the case of *Brady v. Oliver,* (1911) 125 Tenn. 595, 147 S.W. 1135, relied upon by appellant, is not on point. In *Brady,* the Court found that the owner was not justified in rescinding a construction contract before the time for performance had expired. However, the contract in the *Brady* case did not include a schedule clause such as that in the contract involved here. Soefker did not contend that Carrington *would have* breached the contract; he contended that Carrington had *already* breached by July 18, the first completion time specified on the construction schedule.

◾ Carrington further contends on appeal that the construction schedule introduced at trial is not the "Graph Schedule" referred to in the contract. However, the evidence was undisputed that the schedule introduced at trial was the one on display at the job site. On cross-examination, Carrington testified that,

Q. Did you ever realize that there was a progress schedule of work for you to complete by a certain time?

A. At a later date, since I was reminded of it again, I do believe that there was what they call a graph. I do recall that being discussed, but that is just about the limit that I know of it. I never did see one.

Q. You never saw the graph?

A. No.

Q. You didn't even realize at the time that there was a graph? Let's go back to the time when we started the work. I am not talking about your deposition or today. Back at the time that you were going to start this work and were on the job and you signed your contract, etcetera, and had gotten ready for the job, did you realize that you had agreed to a time schedule for completion of your work?

A. No. I don't think that I did.

Q. Did you realize in the very contract itself, it said that work would progress in accordance with a schedule posted in the office, job office? Did you realize that?

A. Pardon me.

Q. Did you realize that your contract said there would be a schedule in the office on the job that would show what would have to be completed by a certain time?

A. I don't recall that.

Q. You just don't recall it?

A. Don't recall it.

Q. Did you ever see that schedule?

A. No.

Q. You never looked in the office for it?

A. I never went in Mr. Soefker's field office at all. I went in the inspector's office and the general contractor's office, I would say, maybe three times. I went in the inspector's office two, three times.

Q. But you realize when we took your deposition and I showed it to you, you realize that your contract said that?

A. Right.

Q. That there was a time schedule in there, but you are telling us that is the first time you realized it?

A. In the deposition?

Q. Yes.

A. Yes.

Q. April 16, 1980?

A. Yes.

Q. So you were proceeding along, I take it, on this job as though there were no time schedule?

A. Making as much time as we could make under the conditions we were working under. It wouldn't make any difference if you had five graphs.

Q. That wasn't my question.

You were proceeding along as though there was no time schedule, right, if you didn't know there was one?

A. I wasn't trying to work to any schedule. They were making as much progress as they could have made regardless if there had been any schedules.

In light of this testimony, Carrington's complaint that the schedule on display at the job site was not the schedule referred to in the contract is belated at best. The contract placed an affirmative duty on Carrington to review the schedule with the General Contractor and thus Carrington's lack of understanding of the schedule cannot excuse his failure to perform in accordance with it.

█ Appellant also argues that his performance up to July 30 was substantial and that the only reasons for the failure to backfill were the failure of his equipment and poor working conditions due to bad weather. However, the contract clearly states that, "shortage of manpower or late delivery dates by his material or equipment suppliers will not be considered conditions beyond the subcontractor's control," which would in turn excuse performance. The evidence shows that the weather conditions were not so adverse that sufficient manpower would not be able to keep the job on schedule and obtaining the necessary equipment was certainly within Carrington's control. Therefore, there is sufficient evidence on the record and in the contract to conclude that the problems Carrington encountered were risks assumed by him under the contract and do not excuse his non-performance. There is also ample evidence that the failure to backfill on schedule was a substantial non-performance.

█ Finally, appellant contends that the Court erred in awarding attorney's fees and expenses to Soefker. The contractual clause providing for such an award is broad indeed:

Should Contractor employ an attorney to enforce any of the provisions hereof, to protect its interest in any matter arising under this contract, or to collect damages for the breach of this contract or to recover on the surety bond given by Subcontractor under this contract Subcontractor and his surety jointly and severally agree to pay Contractor all reasonable costs, charges, expenses and attorney's fees expended or incurred therein.

In attacking the award appellant argues that one should not be permitted to collect attorney's fees as a result of his own breach of a contract. As the Trial Court found, and this Court affirms, that Soefker was not in breach of contract, this argument has no relevance. Appellant also contends that the indemnity clause, also in the contract, does not permit this award of attorney's fees. However, the clause quoted above, not the indemnity clause, may be relied upon for the award given here. Further, the evidence does not preponderate against the reasonableness of an award of $3,802.66 in attorney's fees and expenses. Having to pay substantial fees, largely for one's opponent's defense, is admittedly a difficult pill for the appellant to swallow. However, courts do not re-write contracts merely because a party was unwise to agree to a term therein. The contract has been burdensome for the appellant, but it is not unconscionable, and therefore the appellant is bound by its provisions.

The costs of appeal are adjudged against the appellant and surety, for which execution may issue.

SUMMERS, J., and McLEMORE, Special Judge, concur.