IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
October 10, 2000 Session

## ALLIED BUSINESS BROKERS, INC. v. ABRAHAM MUSA, ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. 72729-1 T.D.;     The Honorable John R. McCarroll, Jr., Judge**

——————————————

**No. W1999-00378-COA-R3-CV - November 22, 2000**

——————————————

This appeal involves a breach of contract regarding a commission owed for the sale of a business. Allied, the broker, claims that Abed Amro owes it a commission based on the contract between the parties. Amro, however, claims that he is not liable under the Listing Agreement even though it is undisputed that he signed the contract. The trial court held that Allied was not entitled to a judgment against Amro because Amro did not have an ownership interest in the business that was sold. We reverse.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

P. Preston Wilson, Memphis, for Appellant

John F. Watson, Memphis, for Appellees

**OPINION**

### Facts and Procedural History

Allied Business Brokers Inc., ("Allied") is in the business of acting as a broker in the purchase and sale of businesses. Mr. Rand Gray ("Gray") is an affiliated broker with Allied. Gray met with Mr. Abed Amro ("Amro") on May 12, 1995, to discuss the possibility of Allied acting as the broker for the sale of a business known as Parkway Discount Grocery ("Grocery") in Memphis.

There is conflicting testimony over whether Amro said he had an ownership interest in the Grocery. Amro claimed that he told Gray that his friend, Mr. Abraham Musa ("Musa"), wanted to sell his business, and that Amro had no interest in the Grocery. Moreover, Amro testified at trial that Musa did not speak English very well, and that he was just bringing Gray and Musa together.

Gray, on the other hand, testified that Amro said he had an interest in the Grocery. Specifically, Gray testified that Amro told him that he was Musa's partner and that Musa operated the Grocery and they shared profits.

After the parties had discussed the possibility of Allied brokering the sale and the commission arrangement, Gray presented a document known as an "Authorization to Sell" or a "Listing Agreement" to Amro and wanted him to sign it because Gray said he did not know Musa. Although Amro was hesitant in signing the Listing Agreement at first, he eventually signed the agreement. After Amro signed the Listing Agreement, Gray and Amro went to see Musa. Gray discussed the terms of the Listing Agreement with Musa and Musa also signed the Listing Agreement.

The Listing Agreement gave Allied the "sole and exclusive right to sell" the Grocery. In addition, the Listing Agreement provided in pertinent part, "[t]he Seller Agrees: To pay the broker the brokerage fee . . . .: (b) if the business is sold, transferred, leased or conveyed in whole or in part for any price or terms during the term of this agreement. . . ." Moreover, the Listing Agreement provided for an exclusive listing period that lasted 180 days and payment of a commission of 12% of the sale price, or $7,500.00, whichever was greater.

After the contract was signed by both Amro and Musa, Gray went back to his office and prepared a profile of the Grocery to aid in its sale. Additionally, Gray began using Allied's database of customers to try to find a purchaser for the Grocery. Moreover, Gray placed advertisements in the newspaper regarding the Grocery. Accordingly, Gray took approximately four potential buyers to see the Grocery over approximately one month. While Gray was showing a potential purchaser the Grocery, Gray learned that the Grocery had already been sold. As a result, Gray contacted Amro. Amro stated that the person that Gray had found in the store was doing their "due diligence" and that no money had transferred. According to Gray, Amro also acknowledged that he owed a commission based on the sale of the business.

The Grocery was sold for $60,000, but the sale was not brokered through Allied. Amro claimed that he never received any money from the sale. Gray never received his commission from either Musa or Amro.

The case began in the Shelby County General Sessions Court on July 28, 1995. The court entered judgment for Allied for $14,559.00. Musa and Amro appealed to the Shelby County Circuit Court. The circuit court entered summary judgment for Allied in the amount of $14,559.00 on December 8, 1995. In May 1996, Plaintiff and Defendants entered into a settlement conditioned upon Defendants making monthly payments to Allied. In the event that Amro and Musa defaulted on the monthly payments to Allied, the previous summary judgment would be reinstated and the case would resume as if the settlement had never occurred. Defendants defaulted in their payments to Allied, and Allied commenced execution.

On May 9, 1997, Allied took a voluntary non-suit as to Defendant Amro. Later, Allied amended its complaint to add Amro as a Defendant. At trial, the court found for Allied with respect to Defendant Musa and entered judgment in the amount of $17,346.00.[1] The court, however, found for Defendant Amro.

The sole issue for our review is whether the trial court erred in denying Allied's claim for commission under the contract signed by Amro on the basis that Amro was not a principal or partner in the Grocery.

## Standard of Review

When a civil action is heard by a trial judge sitting without a jury, our review of the matter is *de novo* on the record, accompanied by a presumption of correctness of the findings below. See Foster v. Bue, 749 S.W.2d 736, 741 (Tenn. 1988); T.R.A.P. 13(d). We may not reverse the findings of fact made by the trial judge unless they are contrary to the preponderance of the evidence. See Jahn v. Jahn, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996). This presumption of correctness, however, does not attach to the trial judge's legal determinations or the trial court's conclusions that are based on undisputed facts. See NCNB Nat'l Bank v. Thrailkill, 856 S.W.2d 150, 153 (Tenn. Ct. App. 1993).

## Law and Analysis

The court below specifically found that Amro signed the Listing Agreement and that Amro was not under any duress when he signed the Listing Agreement. Notwithstanding these findings, the court did not allow Allied to recover against Amro. The court below wanted some proof that Amro was a principal, partner, or in some way affiliated with the Grocery.

We have carefully researched the issue presented to us, and we must respectfully disagree with the trial court's conclusion that Amro must have an ownership interest in the Grocery before he can be liable under the terms of the brokerage contract. First, it is undisputed that Amro signed the Listing Agreement freely and without duress. It is interesting to us that Amro was hesitant at first to sign the Listing Agreement. This shows us that Amro knew the significance of the document and that he was hesitant to become liable for the commission. Nonetheless, Amro did in fact sign the Listing Agreement.

The Listing Agreement is a simple two page contract. It plainly states, "[t]he Seller Agrees: (4) To pay the brokerage fee hereafter stated upon occurrence of any of the following events: (b) [i]f the Business is sold, transferred, leased, merged or conveyed in whole or in part for any price or terms during the term of this agreement." Additionally, the contract plainly sets out the brokerage fee that will be owed if the business is sold. The Listing Agreement clearly states that, "[m]inimum

---

[1] The judgment against Musa appears to be unenforceable, as he has since disappeared.

Fee Shall Be: 12% of consideration of sale but not less than $7,500.00." Furthermore, at the bottom of the contract it states, "AGREED THE SELLER(S): Agreed the Seller(s) who by signing below affirm that (they) (he) (she) have read and understand the contents of this Agreement and further agree that the provisions of this Agreement are binding upon Seller(s) heirs, successors, and/or assigns." Below the aforementioned statement is Amro's signature along with the signature of Musa.

> Our supreme court has stated the following:
>> To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts. In this connection it has been said that one is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise to learn of its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences.

Beasley v. Metropolitan Life Ins. Co., 229 S.W.2d 146, 148 (Tenn. 1950) (internal citations omitted). In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust. See Allstate Ins. Co. v. Wilson, 856 S.W.2d 706, 708 (Tenn. Ct. App. 1992); Tenn. Code Ann. § 47-50-112 (1995). Moreover, this court has stated that, "courts do not rewrite contracts merely because a party was unwise to agree to a term therein." Carrington v. W.A. Soefker & Son, Inc., 624 S.W.2d 894, 897 (Tenn. Ct. App. 1981).

Amro argues that there was no mutual assent between the parties. We disagree. If Amro had not signed the Listing Agreement, Gray would not have listed the Grocery for sale. This was completely clear between the parties. Amro was free to decline Gray's invitation to sign the Listing Agreement and to instruct Gray that Musa should be the only one liable under the contract. If Amro had not signed the Listing Agreement, Gray would have simply walked away without listing the Grocery. Instead, Amro chose to sign the Listing Agreement, knowing that his signature was a condition precedent to the Grocery being listed for sale. Therefore, we must hold, that under the narrow circumstances of this case, Amro is bound by the terms of the contract he signed.

## Conclusion

Accordingly, for the aforementioned reasons, we reverse the judgment of the trial court and remand this case for entry of judgment consistent with this opinion. Costs are taxed to Abed Amro, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE