**Xavier SIKORA**

v.

**Douglas A. VANDERPLOEG.**

Court of Appeals of Tennessee,
at Nashville.

Oct. 12, 2005 Session.

July 3, 2006.

Permission to Appeal Denied by
Supreme Court Dec. 27, 2006.

Kenneth R. Jones, Jr. and William B. Hawkins, III, Nashville, Tennessee, for the appellant, Douglas A. VanderPloeg.

Susan D. Bass and Thomas M. Pinckney, Nashville, Tennessee, for the appellee, Xavier Sikora.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

This appeal involves a dispute over the sale of a chiropractic practice. The purchaser made several significant changes in the practice following the sale and, when the practice began to fail, filed an action for breach of warranty against the seller in the Circuit Court for Davidson County. The seller attributed the failure of the practice to the purchaser's poor business judgment and counterclaimed for unpaid lease payments. Following a three-day bench trial, the trial court found that the seller had breached the warranties of sale and awarded the purchaser $34,443 in damages. The trial court offset this award with a $18,294 judgment in favor of the seller for unpaid lease payments and then awarded the purchaser an additional $52,592 in attorney's fees and costs. We have determined that the trial court erred by failing to reform the purchase agreement to reflect the true agreement between the parties and by concluding that the seller violated his warranty to disclose all material or significant information regarding the practice.

### I.

In 1985, Douglas A. VanderPloeg established VanderPloeg Chiropractic on Murfreesboro Road in Nashville. Ten years later, in 1995, he joined forces with a physician and formed a second, affiliated practice, Priority One Medical, P.C., to provide integrated medical and chiropractic services at the same Murfreesboro Road location. At the same time, Dr. VanderPloeg incorporated Priority One Staff & Equipment, Inc. (Priority One Staff) to furnish management, administrative, and personnel services to VanderPloeg Chiropractic and Priority One Medical. The integrated practice did not perform as well as Dr. VanderPloeg had hoped, and four years later, on May 15, 1999, he dissolved VanderPloeg Chiropractic's relationship with Priority One Medical and Priority One Staff.

Later in 1999, Dr. VanderPloeg decided to sell VanderPloeg Chiropractic and to move to Maine. He hired the Paragon Group, Inc., a New Jersey company specializing in the valuation of chiropractic and other professional practices, to ap-

praise the business and serve as the exclusive listing agent for the sale. The Paragon Group's detailed appraisal report dated December 23, 1999 placed the fair market value of the tangible and intangible assets of VanderPloeg Chiropractic at $200,000 excluding the value of the accounts receivable.

The Paragon Group appraisal report emphasized that the most valuable transferable asset a professional practice like VanderPloeg Chiropractic has is its professional goodwill, i.e., the likelihood that existing patients will continue to purchase chiropractic services in the future as long as patient care remains satisfactory and the practice's professional standards are maintained. Moreover, the report made it clear that the $200,000 figure was based largely on the professional goodwill Dr. VanderPloeg had built up over the preceding fourteen years of successful chiropractic practice at the same location.

Xavier Sikora followed an unconventional path to becoming a chiropractor. He held a number of jobs following his graduation from high school in 1979, including a ten-year stint as a prison guard in Illinois. After receiving chiropractic treatment for a workplace injury, he decided to return to school in 1996 and study to become a chiropractor. He took out loans to support himself and his family while he was in school and received his chiropractic degree from Palmer College in Iowa in October 1999.

Immediately upon receiving his chiropractic degree, Dr. Sikora began looking for an established practice to purchase and operate as a solo practitioner. As part of his search, he contacted the Paragon Group in New Jersey. The Paragon Group sent him its appraisal report for VanderPloeg Chiropractic. Dr. Sikora reviewed the report carefully but, by his own admission, did not understand the analysis and financial data contained in it.[1] Nevertheless, impressed by the professionalism of the report and the amount of information it contained, Dr. Sikora decided to investigate VanderPloeg Chiropractic further. After a single brief trip to Nashville to visit the practice, Dr. Sikora decided to purchase it from Dr. VanderPloeg for $200,000. Thus, on January 27, 2000, he entered into a non-binding letter of intent with Dr. VanderPloeg.

Dr. Sikora hired a Nashville attorney, Arshad (Paku) Khan,[2] to prepare the necessary documents. On February 22, 2000, Mr. Khan sent Dr. VanderPloeg's transactional attorney a draft purchase agreement. It contained a warranty from Dr. VanderPloeg regarding VanderPloeg Chiropractic's total billings and collections for the 1999 calendar year with blanks where the appropriate figures could be inserted. On February 28, 2000, Dr. VanderPloeg's attorney wrote to Mr. Khan thanking him for the draft and suggesting a variety of changes. He advised Mr. Khan that the warranty provision regarding the practice's 1999 billings and collections should be removed because the months prior to "June 1999" would reflect not only the performance of VanderPloeg Chiropractic but also the performance of the integrated practice with Priority One Medical and Priority One Staff.

At some point during the next few weeks, Dr. VanderPloeg provided Dr. Sikora with a handwritten chart showing VanderPloeg Chiropractic's monthly bill-

1. The report contained a wealth of information regarding the practice and its recently terminated relationship with Priority One Medical and Priority One Staff. In addition, it specifically disclosed that Paragon Group was both the appraiser and the exclusive listing agent for the seller, Dr. VanderPloeg.

2. Mr. Khan later left the country and did not testify at trial.

ings for June through December 1999. At the bottom of the column showing each month's billings, the chart indicated that VanderPloeg Chiropractic's total billings for the seven-month period were "[$]257,-952." On March 19, 2000, Dr. Sikora sent his attorney, Mr. Khan, a copy of this chart along with two sheets of paper with notes in Dr. Sikora's handwriting. The chart from Dr. VanderPloeg showed each month's billings from June through December 1999, and one of the sheets in Dr. Sikora's handwriting laid out VanderPloeg Chiropractic's monthly collections for the same period. Dr. Sikora's handwritten notes contained the figures "$257,952" and "$146,609" for billings and collections and indicated clearly that the figures covered the seven-month period from June through December 1999. However, when Mr. Khan inserted the figures into the warranty provision of the purchase agreement, he erroneously indicated that they represented the billings and collections for the *six*-month period from *July* through December 1999 instead of the *seven*-month period from *June* through December 1999 as indicated in the information Dr. VanderPloeg provided to Dr. Sikora and that Dr. Sikora then forwarded to Mr. Khan. No one noticed Mr. Khan's mistake in the dates, and four days later, on March 23, 2000, Dr. Sikora and Dr. VanderPloeg executed the flawed purchase agreement.

A week later, Dr. Sikora executed a separate agreement assuming the lease for the office space on Murfreesboro Road. However, Dr. VanderPloeg remained sec-

ondarily liable for the lease payments. In addition, Dr. VanderPloeg stayed on as a consultant to the practice for sixty days following the sale under a collateral arrangement with Dr. Sikora. During this time, the practice continued to perform well, and new patient flow was satisfactory. However, as soon as Dr. VanderPloeg left, Dr. Sikora began making significant changes to the practice, and business dropped off sharply.[3]

In spite of the fact that the primary asset he had purchased from Dr. Vander-Ploeg was professional goodwill, Dr. Sikora changed the name of VanderPloeg Chiropractic to Absolute Care Chiropractic so that it would be listed first among the chiropractors in the Yellow Pages. He dismissed Dr. VanderPloeg's insurance clerk and receptionist and replaced them with his wife even though she lacked experience in these areas. He changed the professional atmosphere of the office by having his youngest child spend every workday at the office because he and his wife lacked childcare alternatives. Finally, Dr. Sikora relocated the practice to a less desirable building in a deteriorating neighborhood.

Dr. Sikora blamed Dr. VanderPloeg rather than himself for the decline in business. On February 12, 2002, he filed suit against Dr. VanderPloeg in the Circuit Court for Davidson County. Dr. Sikora alleged that Dr. VanderPloeg had falsely warranted that the practice had billings and collections of $257,952 and $146,609,

---

**3.** The practice's performance during the sixty-day consulting period is attributable in part to the fact that Dr. Sikora was able to continue billing certain health insurance plans for the services he provided as long as Dr. Vander-Ploeg remained on staff. As noted in the appraisal report, Dr. VanderPloeg was a member of the provider panels for more than a dozen health insurance companies, and 80% of VanderPloeg Chiropractic's revenue

consisted of payments from insurance carriers. However, Dr. Sikora failed to determine prior to purchasing the practice whether he could become a designated provider for all the same insurers. The insurers that provided coverage for a significant number of Dr. VanderPloeg's patients later denied Dr. Sikora's request to become a member of their provider panels.

respectively, for the six-month period from July through December 1999. He also alleged that Dr. VanderPloeg had violated his warranty to disclose all material or significant information known to him relating to his operation of the practice. Dr. VanderPloeg denied Dr. Sikora's allegations and counterclaimed to recover the unpaid lease payments on the office space following Dr. Sikora's abandonment of the premises.[4]

Following a three-day bench trial, the court entered an order on August 4, 2003 concluding that Dr. VanderPloeg breached his warranties to Dr. Sikora. The trial court acknowledged that the parties intended the billings and collections figures warranted in the purchase agreement to apply to the seven-month period from June through December 1999 instead of the six-month period from July through December 1999. Morover, the trial court found that the billings and collections figures contained in the purchase agreement were correct for June through December 1999 but not for July through December 1999.

Even though it was Dr. Sikora's lawyer, Mr. Khan, who inserted the incorrect dates into the purchase agreement, the trial court determined that Dr. Vander-Ploeg and his lawyer were responsible for the error because they failed to discover it. The trial court cited *Myrick v. Johnson*, 25 Tenn.App. 483, 488, 160 S.W.2d 185, 188 (1941), for the proposition that "[i]nattention, as distinguished from mistake, is no ground for reformation" and refused to reform the purchase agreement on the ground of mutual mistake. Dr. Vander-Ploeg conceded at trial that the warranty, as written, was not accurate. Accordingly, the trial court found that Dr. VanderPloeg violated the warranty regarding Vander-Ploeg Chiropractic's 1999 billings and collections.

The trial court also determined that Dr. VanderPloeg breached his warranty to disclose to Dr. Sikora all material or significant facts known to him regarding his operation of the practice. The trial court based its determination on a February 7, 2000 letter that Dr. VanderPloeg wrote to Dr. Sikora's commercial lender in support of Dr. Sikora's attempt to secure the loan to purchase the practice. In the letter, Dr. VanderPloeg stated that VanderPloeg Chiropractic had experienced a 30% drop in new patient flow during the transition from a combined medical and chiropractic practice back to a chiropractic practice alone following the termination of the integrated practice with Priority One Medical in May 1999. The trial court concluded that this information was a material or significant fact regarding Dr. Vander-Ploeg's operation of the practice, that Dr. VanderPloeg should have specifically and directly disclosed this information to Dr. Sikora, and that his failure to do so violated the disclosure warranty.

■■■ The trial court stated that the proper measure of damages was the difference between the $200,000 contract price and the actual value of VanderPloeg Chiropractic at the time of the sale, plus any contemplated consequential or incidental damages. However, during the three-day trial, Dr. Sikora failed to produce a single expert witness to testify regarding the value of the practice on the date of purchase, and Dr. VanderPloeg's expert witness testified that the value of the practice at that time was at least $200,000 if not more. The

---

4. Dr. VanderPloeg filed cross-claims against the Paragon Group and his own attorneys and accountants as a precaution in the event the court found him liable to Dr. Sikora for breach of warranty. However, the trial court severed the cross-claims and ordered that they be tried separately from the underlying complaint and counter-complaint. Dr. VanderPloeg's cross-claims are not at issue in this appeal.

trial court allowed Dr. Sikora, as the owner of the practice, to testify that it was worth "less than zero" when he purchased it. However, Dr. Sikora's own testimony demonstrated clearly that his "valuation" of the practice was purely speculative.[5]

Faced with this conundrum, the trial court devised a curious method for determining the difference between the contract price and the actual value of the practice on the date of purchase. The court determined that the billings and collections figures contained in the purchase agreement were off by approximately 17% as a result of the drafting errors and then applied this percentage to the $200,000 purchase price to obtain the figure of $34,443. The trial court awarded this sum to Dr. Sikora as damages on his breach of warranty claims.[6]

The court also found that Dr. VanderPloeg was entitled to a setoff of $18,294 as a result of his secondary liability for the lease payments on the office space that Dr. Sikora had failed to pay. However, the court ruled that Dr. VanderPloeg would be entitled to receive the setoff only if he presented proof showing that he had actually paid the amount still due under the lease agreement. The trial court later awarded Dr. Sikora $52,592 in attorney's fees and costs and directed that its present and prior orders be entered as final judgments subject to immediate appeal under Tenn. R. Civ. P. 54.02. Dr. VanderPloeg appealed.

## II.

### THE STANDARDS OF REVIEW

The standards this court uses to review the results of bench trials are well settled. With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn.1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn.Ct.App. 2000). If, however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn.1997).

Reviewing findings of fact under Tenn. R.App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. The prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn.Ct.App.2001); *Realty Shop, Inc. v. RR Westminster*

---

5. In Tennessee, as in most states, a property owner is automatically deemed qualified to offer an opinion as to the value of his or her own property simply by virtue of owning it. *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn.1977); *Stinson v. Stinson*, 161 S.W.3d 438, 446 (Tenn.Ct.App. 2004). However, a property owner's opinion regarding valuation cannot be given any weight where, as here, it is clear that the owner's testimony is founded on pure speculation. *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 256 (Tenn.Ct.App.1990) ("There

must be some evidence, apart from mere ownership, that this 'value' is a product of reasoned analysis."); *accord Whitley v. Whitley*, No. M2003–00045–COA–R3–CV, 2004 WL 1334518, at *8 (Tenn.Ct.App. June 14, 2004) (No Tenn. R.App. P. 11 application filed).

6. On appeal, both parties agree that the formula devised by the trial court to calculate Dr. Sikora's damages was unsound. Naturally, they disagree regarding the approach the trial court should have taken.

*Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn.Ct. App.1999).

Tenn. R.App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo,* 36 S.W.3d 837, 846 (Tenn. Ct.App.2000). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Props. v. Maury County,* 70 S.W.3d at 742. Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn.Ct.App.2000).

The presumption of correctness in Tenn. R.App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson,* 37 S.W.3d 892, 894 (Tenn.2001); *Nutt v. Champion Int'l Corp.,* 980 S.W.2d 365, 367 (Tenn.1998); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 60 S.W.3d 65, 71 (Tenn.Ct.App.2001); *Placencia v. Placencia,* 48 S.W.3d 732, 734 (Tenn.Ct.App. 2000).

## III.

### DR. SIKORA'S BREACH OF WARRANTY CLAIMS

Dr. VanderPloeg takes issue with the trial court's decision regarding both of Dr. Sikora's breach of warranty claims. First, he contends that the billings and collections figures in the purchase agreement were the product of a mutual mistake, not a misrepresentation of the practice's actual billings and collections. Second, he contends that the trial court erred by con-

cluding that he breached the disclosure warranty by failing to inform Dr. Sikora specifically of the decline in the number of new patients because he had fully and accurately disclosed the practice's billings and collections for the relevant period along with a wealth of other information regarding his operation of the practice. We will address each argument in turn.

### A.

### The Nature of Dr. VanderPloeg's Warranties

The warranties involved in this case are contractual in nature. *Au v. Au,* 63 Haw. 210, 626 P.2d 173, 180 (1981); *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618, 627 (1985); *Boudreau v. Baughman,* 322 N.C. 331, 368 S.E.2d 849, 854 (1988). A contractual warranty is an assurance by one party to the contract of the existence of a fact upon which the other contracting party may rely. *Advantage Funding Corp. v. Mid–Tenn. Mfg. Co.,* No. M1997–00133–COA–R3–CV, 2000 WL 64118, at *5 (Tenn.Ct.App. Jan.27, 2000) (No Tenn. R.App. P. 11 application filed). It is intended to relieve the promisee of any duty to ascertain the fact for himself or herself, and it amounts to an agreement by the promisor to indemnify the promisee for any loss if the warranted fact later proves to be untrue. *Lilly Indus., Inc. v. Health–Chem Corp.,* 974 F.Supp. 702, 711 (S.D.Ind.1997); *Walter Dawgie Ski Corp. v. United States,* 30 Fed. Cl. 115, 126 (1993); *Hoover v. Nielson,* 20 Ariz.App. 130, 510 P.2d 760, 763 (1973); *Sterling Capital Advisors, Inc. v. Herzog,* 575 N.W.2d 121, 127 (Minn.Ct.App.1998).

A contractual warranty may be express or implied, *Ramage v. Forbes Int'l, Inc.,* 987 F.Supp. 810, 816 (C.D.Cal. 1997); *Camino Real Mobile Home Park P'ship v. Wolfe,* 119 N.M. 436, 891 P.2d

1190, 1196 (1995); *Lucas v. Canadian Valley Area Vocational Technical Sch.*, 824 P.2d 1140, 1141 (Okla.Civ.App.1992), and it need not be stated in any particular or technical language, *Taratus v. Smith*, 245 Ga. 107, 263 S.E.2d 145, 146 (1980); *County of Somerset v. Durling*, 174 N.J.Super. 52, 415 A.2d 371, 374 (Ch. Div.1980). A breach of warranty occurs when the warranted fact or condition is in reality not as it was represented. *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 151 N.W.2d 477, 482 (Iowa 1967). A person seeking to prove a breach of warranty has the dual burden of proving the pertinent terms of the warranty and the fact that those terms were breached. *Collier v. Rice*, 233 Va. 522, 356 S.E.2d 845, 847 (1987).

## B.

### The Warranties Involving the Practice's Billings and Collections

■ There is no dispute that the billings and collections figures in the purchase agreement did not accurately reflect the practice's actual billings and collections for the stated period. Dr. VanderPloeg insists that the error regarding the dates included in the billings and collections information was the result of a drafting error by Dr. Sikora's lawyer and that the trial court should have invoked the doctrine of mutual mistake to correct this error. We agree.

■ The courts must interpret contracts as they are written, *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975); *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn.Ct.App.1999), and are not at liberty to make a new contract for parties who have spoken for them-

selves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955); *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn.Ct.App.1993). Accordingly, the courts do not concern themselves with the wisdom or folly of a contract, *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960); *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321, 324 (Tenn.Ct.App.1996), and will not relieve parties from contractual obligations simply because they later prove to be burdensome or unwise, *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn.Ct.App.1991); *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn.Ct.App.1983); *Carrington v. W.A. Soefker & Son, Inc.*, 624 S.W.2d 894, 897 (Tenn.Ct.App.1981).[7]

■ Nevertheless, the law's strong policy favoring the enforcement of contracts as written must occasionally give way. Thus, it is well settled that the courts have the power to alter the terms of a written contract where, at the time it was executed, both parties were operating under a mutual mistake of fact or law regarding a basic assumption underlying the bargain. *Alexander v. Shapard*, 146 Tenn. 90, 105–15, 240 S.W. 287, 291–94 (1922); *Cromwell v. Winchester*, 39 Tenn. (2 Head) 389, 390–91 (1859). The courts are also empowered to modify the provisions of a written contract where only one of the parties was operating under a mistake of fact or law if the mistake was influenced by the other party's fraud. *Dickens v. St. Paul Fire & Marine Ins. Co.*, 170 Tenn. 403, 414–17, 95 S.W.2d 910, 914–15 (1936); *Jones v. Jones*, 150 Tenn. 554, 596, 266 S.W. 110, 121 (1924); *Pittsburg Lumber Co. v. Shell*, 136 Tenn. 466, 472, 189 S.W. 879, 880 (1916); *Pierce v. Flynn*, 656 S.W.2d 42, 46 (Tenn.Ct.App.

7. *See also* 28 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 70:209, at 232 (4th ed. 2003) (Williston on Contracts) ("Courts are not in the business of rewriting contracts to bail out parties who have failed to prudently construct their business transactions.")

1983); RESTATEMENT (SECOND) OF CONTRACTS §§ 152 & cmt. *a*, at 385–86, 153 & cmt. *a*, at 394 (1981).

■ The judicial alteration of the provisions of a written agreement is an equitable remedy known as "reformation." *Greer v. J.T. Fargason Grocer Co.*, 168 Tenn. 242, 244–45, 77 S.W.2d 443, 443–44 (1935); *Tenn. Valley Iron & R.R. Co. v. Patterson*, 158 Tenn. 429, 433, 14 S.W.2d 726, 727 (1929).[8] The basic purpose of reformation is to make the contract "conform to the real intention of the parties." *Lebo v. Green*, 221 Tenn. 301, 314, 426 S.W.2d 489, 494 (1968). It is "driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties." 27 WILLISTON ON CONTRACTS § 70:2, at 210. Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by a preponderance of the evidence. Instead, the evidence of mistake must be clear and convincing. *Hazlett v. Bryant*, 192 Tenn. 251, 263, 241 S.W.2d 121, 125–26 (1951); *Tenn. Hoop Co. v. Templeton*, 151 Tenn. 375, 379–80, 270 S.W. 73, 75 (1925); *Sawyer v. Sawyer*, 106 Tenn. 597, 603, 61 S.W. 1022, 1023 (1901);

*Bailey v. Bailey*, 27 Tenn. (8 Hum.) 230, 233 (1847); RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. *c*, at 410.[9]

■ An important subcategory of mistake is mistake in the expression, or integration, of the agreement. *Jones v. Jones*, 150 Tenn. at 595, 266 S.W. at 121; *Alexander v. Shapard*, 146 Tenn. at 106–07, 240 S.W. at 291; RESTATEMENT (SECOND) OF CONTRACTS ch. 6 introductory note, at 379, 381, § 155 & cmt. *a*, at 406–07.[10] A mistake in expression occurs where one or both parties to a written contract erroneously believe that the contract embodies the agreement that both parties intended it to express. In such cases, the courts may adjust the provisions of the written contract to make it express the true agreement reached by the parties. *Alexander v. Shapard*, 146 Tenn. at 107, 240 S.W. at 291; 27 WILLISTON ON CONTRACTS § 70:20, at 257.

■ In order to obtain reformation on the basis of mistake in expression, a party must present clear and convincing evidence that: (1) the parties reached a prior agreement regarding some aspect[11] of the bargain; (2) they intended the prior agreement[12] to be included in the written

---

8. *See also* 7 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 28.45, at 281 (rev. ed. 2002) (CORBIN ON CONTRACTS); 28 WILLISTON ON CONTRACTS § 70:209, at 230. The remedy of reformation finds its roots in the maxim that "equity treats that as done which ought to have been done." 27 WILLISTON ON CONTRACTS § 70:19, at 255.

9. *See* 7 CORBIN ON CONTRACTS § 28.45, at 281 ("A court will decree reformation of a written instrument if it is conclusively shown that the words of the writing do not correctly express the meaning that the parties agreed upon.").

10. *See, e.g., Cincinnati Ins. Co. v. Fred S. Post, Jr., Co.*, 747 S.W.2d 777, 781 (Tenn.1988); *Lebo v. Green*, 221 Tenn. at 314, 426 S.W.2d at 494; *Dickens v. St. Paul Fire & Marine Ins. Co.*, 170 Tenn. at 414, 95 S.W.2d at 914; *Greer v. J.T. Fargason Grocer Co.*, 168 Tenn. at

244–45, 77 S.W.2d at 443–44; *Barnes v. Barnes*, 157 Tenn. 332, 338, 8 S.W.2d 481, 482 (1928).

11. *See* 27 WILLISTON ON CONTRACTS § 70:21, at 260 ("If the parties reach agreement as to only part of a prospective bargain, ... reformation is still an appropriate remedy."); *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 (Del.2002) (holding that the party seeking reformation must prove "a specific prior understanding that differed materially from the written agreement," and that "[t]his understanding need only be complete as to the issue involved [and] need not constitute a complete contract in an of itself").

12. The prior agreement need not rise to the level of a separately enforceable contract. *Alexander v. Shapard*, 146 Tenn. at 107, 240

contract; (3) the written contract materially differs from the prior agreement; and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation. 7 CORBIN ON CONTRACTS § 28.45, at 283; 27 WILLISTON ON CONTRACTS §§ 70:19, at 256, 70:23, at 264–65. Reformation is not automatically barred simply because one of the parties denies that there was an antecedent agreement or claims that the mistake was not mutual. 27 WILLISTON ON CONTRACTS §§ 70:13, at 231, 70:21, at 258–59.

■■■■■ As long as the party seeking reformation establishes the elements of a mistake in expression, any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake (unless, of course, there is evidence of fraud). *Alexander v. Shapard,* 146 Tenn. at 108, 111, 240 S.W. at 292–93. As a noted commentator on the law of contracts has explained:

[E]very unintended variance between the prior agreement and the writing is deemed to constitute a mutual mistake.... When courts speak of mutuality of the mistake, they usually mean that a mistaken belief by one party

S.W. at 292; *see also* 7 CORBIN ON CONTRACTS § 28.45, at 283 ("It is not a prerequisite to an action for reformation that the antecedent agreement be a contract."); 27 WILLISTON ON CONTRACTS § 70:21, at 260 ("The prior agreement need not ... be complete and certain enough to be a contract.").

**13.** *See also Dickens v. St. Paul Fire & Marine Ins. Co.,* 170 Tenn. at 414, 95 S.W.2d at 914 ("Certainly it will be conceded that the insurance company intended to name as the assured the owners of the property [in the policy]. To assume otherwise would be to impute to the company a willful purpose to defraud. The draftsman for the insurance company then clearly made a mistake."); 27 WILLISTON ON CONTRACTS § 70:93, at 495 ("To reform a contract based on mistake, a plaintiff must establish that the contract was executed un-

alone that the writing will contain a given provision is not a ground for reformation. But this is encompassed in the requisite that there be a prior agreement that the provision be included in the writing.

7 CORBIN ON CONTRACTS § 28.45, at 283–84 (footnotes omitted).[13]

The record on appeal contains overwhelming evidence of a prior agreement between Dr. VanderPloeg and Dr. Sikora to the effect that VanderPloeg Chiropractic's 1999 billings and collections were $257,952 and $146,609, respectively, for the *seven*-month period from *June* through December 1999. In addition, it is beyond cavil that the parties intended to include a warranty in the written contract containing Dr. VanderPloeg's representation regarding these figures.[14] Moreover, it is undisputed that the billings and collections warranty contained in the purchase agreement does not accurately express this prior understanding. There is also no evidence in the record to suggest that the incorrect dates were incorporated into the written contract as a result of gross negligence on the part of Dr. VanderPloeg or his attorney. Accordingly, the legal criteria for reformation were met.

der mutual mistake or a unilateral mistake induced by the defendant's fraudulent misrepresentation. However, where there is no mistake about the agreement and the only mistake is in the reduction of the agreement to writing, such mistake of the scrivener or of either party, no matter how it occurred, may be corrected.").

**14.** For example, the record contains a fax Dr. Sikora sent to his attorney, Mr. Khan, on March 19, 2000, just four days prior to the execution of the purchase agreement on March 23, 2000. The fax contains Dr. Sikora's handwritten notations showing that he knew not only the seven-month totals for billings and collections for June through December 1999, but also the billings and collections numbers for each month within this seven-month period.

Dr. Sikora nevertheless contends that the trial court properly denied reformation for two reasons. First, he claims that the mistake regarding the dates covered by the warranty was not mutual and, therefore, cannot serve as a basis for reformation of the purchase agreement. In other words, Dr. Sikora maintains that he thought all along that the billings and collections figures of $257,952 and $146,609 were for the *six*-month period from *July* through December 1999, not for the *seven*-month period from *June* through December of that year. Dr. Sikora's claim strains credulity, to put it mildly. The evidence in the record—some of which is in Dr. Sikora's own handwriting—shows clearly that both Dr. Sikora and his attorney knew four days prior to the execution of the purchase agreement that the precise numbers ultimately included in the warranty provision were for the seven-month period from June through December 1999, not the six-month period from July through December 1999.

The most charitable interpretation of Dr. Sikora and Mr. Khan's conduct is that Mr. Khan inadvertently included the wrong dates in the purchase agreement, that Mr. Khan then failed to catch his error before the closing date, and that Dr. Sikora and Dr. VanderPloeg then executed the twelve-page agreement without noticing that the dates in the warranty provision were off by two letters (i.e., *July* instead of *June* ). Thus, the evidence in the record shows clearly that the mistake regarding the dates was mutual as a matter of fact. Moreover, as explained above, a mistake in expression is deemed to be mutual as a matter of law if the party seeking reformation establishes by clear and convincing evidence that there was a prior agreement, the parties intended it to be included in the later written contract, the written contract is at variance with the prior agreement, and the party seeking reformation is not guilty of gross negli-

gence. Accordingly, we find Dr. Sikora's argument against reformation based on an alleged lack of mutuality in the mistake insupportable on both the facts and the law.

In his second argument against reforming the warranty provision, Dr. Sikora reiterates the trial court's reasoning, i.e., he contends that reformation is unavailable as a matter of law because the mistake in the dates resulted from the "inattention" of Dr. VanderPloeg and his attorney in failing to discover Mr. Khan's drafting error. In support of this claim, Dr. Sikora cites this court's statement in *Myrick v. Johnson*, 25 Tenn.App. at 488, 160 S.W.2d at 188, that "[i]nattention, as distinguished from mistake, is no ground for reformation."

Dr. Sikora has taken this statement out of context. Taken as an abstraction, the quote from *Myrick v. Johnson* is not a correct statement of the law regarding mistake. While a handful of Tennessee cases contain comments along the lines of the quote from *Myrick v. Johnson* relied on by Dr. Sikora, *see, e.g., Jones v. Jones*, 150 Tenn. at 594–95, 266 S.W. at 120–21; *Silsbe v. Houston Levee Indus. Park, LLC*, 165 S.W.3d 260, 266 (Tenn.Ct.App.2004); *Henry v. S. Fire & Cas. Co.*, 46 Tenn.App. 335, 344, 330 S.W.2d 18, 23 (1958), it is clear from the context that the courts were using the word "inattention" as a synonym for, or one aspect of, negligence. Moreover, other cases, including some going back to the first part of the last century, make it clear that "inattention," at least as that word is used in common parlance, is not an absolute bar to reformation under Tennessee law. *Alexander v. Shapard*, 146 Tenn. at 109, 240 S.W. at 292; *Feder v. Gass*, 59 S.W. 175, 176 (Tenn.Ch.App. 1900).

It would make little sense to impose a categorical exemption to the doc-

trine of mistake whenever the underlying mistake could accurately be described as resulting from "inattention" as opposed to some other cause. If inattention were enough to defeat a claim for reformation based on a mistake in expression, the remedy would almost never be available to correct typographical mistakes and scriveners errors, because parties have a duty to read the written contracts they enter into and are ordinarily charged with knowledge of their contents regardless of whether they have actually read them.[15] Accordingly, reformation is denied only in "extreme cases" where a party's fault "amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." RESTATEMENT (SECOND) OF CONTRACTS § 157 & cmt. a, at 416; accord 27 WILLISTON ON CONTRACTS § 70:48, at 345. Thus, the level of negligence required to defeat a claim for reformation based on a mistake in execution is often described as "gross negligence." See, e.g., Rentenbach Eng'g Co. v. Gen. Realty Ltd., 707 S.W.2d at 527; see also Rotenberry v. Hooker, 864 So.2d 266, 271–278 (Miss. 2003); 27 WILLISTON ON CONTRACTS §§ 70:49, at 346, § 70:113, at 561.

■ ■ ■ A party's failure to catch a drafting error when reading over a written contract does not normally rise to the level of "gross negligence" that will bar reformation. Rentenbach Eng'g Co. v. Gen.

Realty Ltd., 707 S.W.2d at 527; 27 WILLISTON ON CONTRACTS §§ 70:48, at 346, 70:113, at 561. This is true even where the party seeking reformation is the one who drafted the contract. Cincinnati Ins. Co. v. Fred S. Post, Jr., Co., 747 S.W.2d at 781; 27 WILLISTON ON CONTRACTS § 70:93, at 497;[16] InvesSys, Inc. v. McGraw-Hill Cos., 369 F.3d 16, 17–18 (1st Cir.2004) (reforming sales contract that inadvertently included rights to a software program that was not intended to be part of the deal even though a provision was added by seller's own attorney and company officials reviewed the contract prior to executing it but failed to catch the error)

The only reasonable interpretation of the evidence in this record is that Dr. Sikora's lawyer made an error when he drafted the purchase agreement. The language he drafted regarding the history of the practice's billings and collections differed from the information both parties had in their possession and from the information that Dr. Sikora had provided him. In light of the fact that both parties had been privy to the correct billings and collections figures for some time when they executed the purchase agreement, the trial court erred by placing the entire burden of the drafting error on Dr. VanderPloeg's shoulders and by declining to invoke the doctrine of mutual mistake to conform the

15. See Rentenbach Eng'g Co. v. Gen. Realty Ltd., 707 S.W.2d 524, 527–28 (Tenn.Ct.App. 1985) ("In this regard, it would appear that if mere negligence precludes relief, very few if any instruments could be reformed on the ground of mutual mistake, because if a party uses due care in reading an instrument he would never sign one which did not contain the parties' agreement."); RESTATEMENT (SECOND) OF CONTRACTS § 157 cmt. a, at 416 ("The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance or reformation. Indeed, since a party can often avoid a mistake by the exercise of such

care, the availability of relief would be severely circumscribed if he were to be barred by his negligence.") (citations omitted); accord 27 WILLISTON ON CONTRACTS § 70:48, at 344–45.

16. As one commentator put it, "Where there is a mutuality of assent but the resulting document intended to express such agreement fails to do so by reason of the mistake of the drafter, it is immaterial who employed the scribe.... No matter even if one of the parties is the drafter as the real concern is: Does the document express the agreement of the parties?" 27 WILLISTON ON CONTRACTS § 70:93, at 499.

language in the agreement to the information the parties possessed.

## C.

### The Disclosure of the Decline in New Patients

Dr. VanderPloeg also contends that the trial court erred by concluding that he breached his warranty to disclose all the material or significant information regarding his operation of the practice. He insists that his disclosures regarding the practice's billings and collections and the termination of its relationship with Priority One Medical and Priority One Staff obviated the need to provide more specific information regarding the percent of decrease in the number of new patients during the transition period following the dissolution of the integrated practice ten months prior to the execution of the purchase agreement.

■■■ Dr. Sikora has failed to explain, much less prove, how Dr. VanderPloeg's failure to provide him with specific information regarding the decrease in the number of new patients ten months prior to the execution of the purchase agreement was material to, or even a significant factor in, his decision to purchase Vander-Ploeg Chiropractic for $200,000. The trial court specifically found, and the evidence in the record confirms, that the primary factors in Dr. Sikora's decision to purchase the practice were the billings of $257,952 and collections of $146,609 during the seven-month period in 1999 after Dr. Vander-Ploeg terminated the practice's relationship with Priority One Medical. However, this time frame is precisely the period of

time Dr. VanderPloeg was referring to when he wrote to Dr. Sikora's commercial lender [17] in February 2000 that the practice has experienced a 30% drop in new patient flow following the transition from an integrated practice back to a chiropractic practice alone.

Moreover, the evidence in the record does not suggest any particular reason that there would have been a significant lag time between May 15, 1999, when the integrated practice shut down and the time when the effects of the drop in new patient flow would start to appear in VanderPloeg Chiropractic's billings figures. It is true that the Paragon Group report indicates that VanderPloeg Chiropractic typically scheduled its patients for six appointments at a time. However, there is nothing in the record to suggest that most or even many of Dr. VanderPloeg's patients usually saw him on only a monthly basis. For example, the Paragon Group report defines "maintenance visits" as visits that occur weekly or less frequently. In addition, the practice's patient billing records suggest that in most cases, Dr. Vander-Ploeg saw clients for multiple sessions on a weekly basis or with even greater frequency, and not on a monthly basis only.

The evidence in the record shows that VanderPloeg Chiropractic's billings and collections dropped off immediately after the termination of the integrated practice in May 1999. For example, while the integrated practice had monthly billings of $93,933 and $62,580 in March and April 1999, respectively, VanderPloeg Chiropractic had monthly billings of only $35,381 and $26,337 in July and August

---

17. We note the fact that Dr. VanderPloeg provided this information, in writing, to Dr. Sikora's own lender, not because the knowledge of the information is, therefore, imputed to Dr. Sikora, but rather because it suggests that Dr. VanderPloeg was making no effort to conceal the one-time decrease in new patient flow from Dr. Sikora. As explained below, Dr. VanderPloeg had no reason to hide the information, because the impact on the practice was reflected in the financial information he had already provided directly to Dr. Sikora.

1999.[18] Moreover, the practice's average monthly billings dropped from $76,911 during the first four months of 1999 to just over $36,850 in the last seven months of 1999 (due in part, no doubt, to the decrease in new patient referrals to which Dr. VanderPloeg alluded in his February 7, 2000 letter to Dr. Sikora's lender.) Thus, the information on which Dr. Sikora primarily relied in deciding to purchase the practice—i.e., the billings and collections figures for June through December 1999—already reflected the impact of the decrease in new patient flow following VanderPloeg Chiropractic's termination of its relationship with Priority One Medical and Priority One Staff in mid-May 1999.

In other words, Dr. Sikora decided to purchase VanderPloeg Chiropractic based primarily on figures compiled for the seven-month period after the drop in new patient referrals had already occurred. We fail to see—and Dr. Sikora has not provided a satisfactory explanation on his own—how the additional information regarding the percentage drop in the number of patients would have been material or significant to his decision to purchase VanderPloeg Chiropractic for $200,000 given all the other information Dr. VanderPloeg had already disclosed to him. Accordingly, the trial court erred in concluding that Dr. VanderPloeg violated the disclosure warranty contained in the purchase agreement.

## IV.

### THE AWARD OF ATTORNEY'S FEES AND COSTS

Finally, Dr. VanderPloeg takes issue with the trial court's decision to award Dr. Sikora $52,592 in attorney's fees and costs. This award is based on the provision in the purchase agreement permitting either party to recover fees and costs if he is required to seek judicial enforcement of his rights under the purchase agreement and the court enters a judgment substantially in his favor. We need not address Dr. VanderPloeg's argument that the trial court did not decide the case "substantially" in Dr. Sikora's favor because we have determined that the trial court erred by concluding that Dr. VanderPloeg breached his warranties at all. In light of our ruling that Dr. Sikora has not prevailed on any of his claims, he is not entitled to attorney's fees and costs under the purchase agreement, and the award for these fees and costs must be vacated.

## V.

We reverse the portions of the trial court's August 4, 2003 and December 17, 2003 orders awarding judgments to Dr. Sikora. Accordingly, we remand the case with directions to enter a revised judgment dismissing Dr. Sikora's complaint and for any other proceedings consistent with this opinion that may be required. We tax the costs of this appeal to Xavier Sikora for which execution, if necessary, may issue.

---

18. The billings and collections figures for the months prior to the dissolution of the integrated practice on May 15, 1999 reflect the performance of the entire integrated practice, not the chiropractic portion alone.