IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 1, 2020 Session

## FRANKLIN REAL ESTATE GROUP, INC. v. SPERO DEI CHURCH

**Appeal from the Chancery Court for Davidson County**
**No. 18-1094-III       Ellen Hobbs Lyle, Chancellor**

_____

### No. M2019-01691-COA-R3-CV

_____

A real estate broker filed a complaint against a client alleging that the client breached the parties' brokerage agreement by purchasing a property and not paying a commission to the broker. The client filed a motion for summary judgment asserting that the brokerage agreement was void for vagueness because one of its provisions was illogical. The trial court disagreed with the client after concluding that any confusion was due to a simple drafting error. The trial court reformed the brokerage agreement to reflect the parties' intentions and determined that the client breached the brokerage agreement as reformed. The trial court then, sua sponte, granted summary judgment to the real estate broker. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Benjamin Ealey Goldammer, Nashville, Tennessee, for the appellant, Spero Dei Church.

Douglas Berry, Nashville, Tennessee, and Robert F. Parsley and Ian Christopher Quillen, Chattanooga, Tennessee, for the appellee, Franklin Real Estate Group, Inc.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves a contractual dispute between Franklin Real Estate Group, Inc. ("Broker"), a licensed real estate broker in Tennessee, and Spero Dei Church ("the Church"). In 2017, the parties entered into an Exclusive Buyer/Tenant Representation Agreement ("the Agreement") whereby the Church would pay Broker a four percent commission if the Church entered into a purchase contract during the one-year term of the

Agreement. The Agreement included a "carryover" provision providing that the Church would pay Broker a four percent commission if, during the six months following expiration of the Agreement, the Church entered into a purchase contract for a property that had been introduced to it by Broker during the one-year term.

Before executing the Agreement, the parties had prior dealings that provide context for the Agreement. Specifically, on February 16, 2016, the parties entered into a Commercial Listing Agreement ("Seller's Agreement") providing that Broker would act as the Church's exclusive agent in the sale of the Church's property located at 8001 Highway 70 South, Bellevue, Tennessee ("the Bellevue Property"). Broker found a buyer for the Bellevue Property, and the property sold for $10,200,000, for which the Church paid Broker a two percent commission pursuant to the terms of the Seller's Agreement.

During the term of the Seller's Agreement, the Church asked Broker to search for properties closer to downtown Nashville that the Church might move into after the Bellevue Property sold. Initially, Broker saw no need for a commission agreement with the Church for its services as the buyer's agent because the Church was only considering properties listed for sale. Broker thus assumed that the seller's agent of any such property would agree to split its commission with Broker. When the Church requested that Broker widen its search to include properties that were not listed for sale, Broker became concerned that it would not be paid a commission for its services. To address that concern, Eric Boozer, Broker's president, drafted the Agreement. Mr. Boozer used language from the Seller's Agreement as a template, simply substituting "Seller" for "Buyer" where appropriate to make the Agreement conform to a standard buyer's agent agreement. He intended that paragraph 5 of the Agreement say, in pertinent part:

> Should the Client contract to purchase, exchange, lease, or contract to lease with the option to buy, within the carryover period, property from any Seller/Landlord whose property has been shown or introduced to the Client, directly or indirectly, by Broker during the term, the Client agrees to pay a 4% commission as set forth above in Section 3.

Instead, paragraph 5 of the Agreement states as follows:

> 5. Term. The term of this agreement will be for one (1) year expiring one year from the date of full execution below. The carryover period is defined as 6 months after the termination of this agreement and any extensions thereof. *Should the Client contract to purchase, exchange, leased [sic], or contract to lease with the option to buy, within the carryover period to any Seller/Landlord who has been introduced to the property, directly or indirectly, by Broker during the term, Client agrees to pay a 4% commission as set forth above in Section 3.*

- 2 -

(Emphasis added).

Mr. Boozer sent the Agreement via email to David Perez, the pastor of the Church, on March 17, 2017. In this email, Mr. Boozer explained the purpose of the Agreement, in pertinent part, as follows:

> Because some of the properties you are interested in are not officially listed for sale, it may be difficult for us to secure a commission from the Seller and/or Landlord. Consequently, we have attached a commission agreement for execution, which establishes the terms for which the Client [the Church] may be fully or partially responsible for our commission in the event the Seller/Landlord refuses to pay an adequate percentage.

Mr. Perez received the Agreement on March 20, 2017, and that same day, sent Mr. Boozer the following email inquiring about what circumstances would entitle Broker to a commission:

> i am sending over the agreement on buying land.
> i have a question about leasing agreements, if there is some sort transition???
> is there some sort of commission if you guys find it?
> and I am assuming there is no commission if we find it on our own?
> i have signed the agreement and my assistant will fax it back.
> dp

Less than an hour later, Mr. Boozer replied to the email and answered Mr. Perez's question as follows:

> The exclusive buyer's agent agreement provides that if [the Church] and/or assigns consummates a sale or lease agreement during the stated term, then Franklin Real Estate Group will receive a 4% commission. Hopefully, the Seller/Landlord will pay all the commission, however, if the Seller or Landlord does not agree to pay at least 4% then [the Church] will make up the difference.
> If you find a space on your own and would like to pursue it for purchase or lease, just let us know and we can assist in the process. If you choose to negotiate the deal yourselves, a 4% commission is still owed to Franklin Real Estate Group, as we will have an "Exclusive" buyer's agent agreement during the stated term.
> Hope this answers your questions. If you would like to discuss further, please call me . . . .

Mr. Perez responded that he would "forward your comments to (the) Leadership Board for their due diligence." Later that day, on March 20, 2017, Mr. Perez notified Mr.

- 3 -

Boozer that the Church had executed the Agreement and the signed document would be returned to Mr. Boozer. Neither Mr. Perez nor any other representative of the Church raised any further concerns about the language contained in the Agreement.

On March 17, 2017, the day Broker emailed Mr. Perez the Agreement, Mr. Perez drove around various parts of Nashville and saw a church building and land located at 3701 Park Avenue ("the Park Avenue Property"). He stopped and took photographs of the property. At that time, the Park Avenue Property was not for sale.

On May 2, 2017, Mr. Boozer emailed Mr. Perez information about four properties located in the Sylvan Park area that possibly met the Church's requirements. One of these properties was the Park Avenue Property. Mr. Boozer sent Mr. Perez a follow-up message on June 2, 2017, urging him to consider the Park Avenue Property: "You might look at 3701 Park Avenue. Grace Evangelical. I could never get anyone to answer the phone." The following week, Mr. Boozer and his business partner accompanied Mr. Perez for an on-site inspection of the Park Avenue Property. During the inspection, Mr. Perez expressed some concern that the Park Avenue Property did not have adequate parking. Mr. Boozer suggested that the Church could possibly resolve that issue by using the parking lot of a neighboring school for additional parking during church services.

At no point during the term of the Agreement or the carryover period, did Mr. Perez inform Broker that he was already familiar with the Park Avenue Property, had previously taken photographs of it, or had ever considered it as a relocation site for the Church. After the Park Avenue Property was listed for sale on March 10, 2018, Mr. Perez never requested that Broker pursue negotiations with the seller about purchasing the property. Moreover, he never mentioned that the Church did not expect to pay Broker a commission if the Church purchased the Park Avenue Property because the Church had already "introduced" itself to that property.

During the Agreement's one-year term, Broker provided the Church with information about more than 100 properties and negotiated several written offers with various sellers. Ultimately, the Church failed to come to an agreement with any of those sellers. After the term of the Agreement expired, but within the carryover period, the Church entered into a contract with Randy Holland, a real estate broker and parishioner of the Church, whereby Mr. Holland acted as the Church's agent in negotiations to purchase the Park Avenue Property. The Church closed on that property on August 2, 2018, paying $1,980,000. The Church paid Mr. Holland, not Broker, a commission for the purchase.

On October 9, 2018, Broker filed a complaint against the Church alleging breach of contract. Thereafter, the Church filed a motion for summary judgment arguing that the Agreement was too indefinite to be enforced because the carry-over provision in paragraph 5 was poorly drafted. The Church further argued that, if the Agreement was not too indefinite, the Church had no obligation to pay Broker a commission because Broker had

not "introduced" the Church to the Park Avenue Property. In its response to the motion for summary judgment, Broker argued that the trial court should reform the Agreement under the doctrine of mutual mistake and that summary judgment should not be granted because Broker had introduced the Church to the Park Avenue Property within the meaning of the Agreement.

In a memorandum and order entered on July 18, 2019, the trial court denied the Church's motion for summary judgment and, sua sponte, granted summary judgment to Broker. The court concluded that, although Broker had not moved for summary judgment, it was entitled to summary judgment because the undisputed facts warranted reformation of the Agreement under the doctrine of mutual mistake and that, under the Agreement as reformed, Broker had introduced the Church to the Park Avenue Property. The court then awarded Broker its four percent commission in the amount of $79,200, plus $3,977.26 as prejudgment interest.[1]

The Church appealed and raises several issues for our review which we consolidate and restate as follows: whether the trial court erred in granting summary judgment to Broker.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Therefore, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions,

_____

[1] On appeal, the Church does not challenge the award of prejudgment interest.

responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). In Tennessee, a trial court may grant summary judgment sua sponte,

> but "only in rare cases and with meticulous care" when "the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law."

*Patton v. Estate of Upchurch*, 242 S.W.3d 781, 791 (Tenn. Ct. App. 2007) (quoting *Thomas v. Transport Ins. Co.*, 532 S.W.2d 263, 266 (Tenn. 1976)); *see also Nashboro Golf Course, LLC v. Townhomes of Nashboro Village, L.P.*, No. M2017-00226-COA-R3-CV, 2018 WL 4382073, at *4 (Tenn. Ct. App. Sept. 14, 2018).

Contract interpretation, like our review of a trial court's summary judgment determination, is a matter of law that we review de novo, with no presumption of correctness. *Fed. Ins. Co. v Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

ANALYSIS

I. Void for Vagueness.

The Church contends that the trial court erred in granting summary judgment to Broker because the Agreement was void for vagueness. According to the Church, the following language from paragraph 5 of the Agreement renders the Agreement void for vagueness:

> Should the Client contract to purchase, exchange, leased [sic], or contract to lease with the option to buy, within the carryover period *to any Seller/Landlord who has been introduced to the property, directly or indirectly, by Broker during the term*, Client agrees to pay a 4% commission as set forth above in Section 3.

(Emphasis added).

The Church correctly points out that, under Tennessee law, the following requirements must be satisfied to form an enforceable contract:

> To be enforceable, a contract must result from a meeting of the minds, be based on sufficient consideration, and be sufficiently definite. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id.* at 553-554 (citing Restatement (2d) Contracts, § 33 (1981)). When a term is left open for future negotiation, there is nothing more than an unenforceable agreement to agree. *See Four Eights, L.L.C. v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005). "It is a fundamental rule of law that an alleged contract which is so vague, indefinite and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." *Id.* at 487 (quoting *United Am. Bank of Memphis v. Walker,* 1986 WL 11250 (Tenn. Ct. App. 1986) (quoting *King v. Dalton Motors, Inc.*, 260 Minn. 124, 109 N.W.2d 51 (1961)).

*Cadence Bank, N.A. v. Alpha Trust*, 473 S.W.3d 756, 774 (Tenn. Ct. App. 2015). The Church argues that the language in paragraph 5 of the Agreement is vague because it "makes no sense whatsoever in the context of a buyer's brokerage agreement" and because "[t]here is never a scenario in the context of a buyer's brokerage agreement where the buyer's broker has introduced the seller to the very property that the seller is offering for sale." We agree that, as drafted, the carryover commission provision in paragraph 5 is illogical. We disagree, however, that the determinative issue is whether this language renders the Agreement void for vagueness. No term in the Agreement is left open, and the essential terms are not so uncertain as to prevent a determination of whether they have been satisfied. Rather, as the trial court found, it is clear from the face of the Agreement that any confusion is the result of a mistake or omission because paragraph 5 confounded "Seller/Landlord" with "Client," making it appear that the seller was being introduced to its own property. Therefore, the pertinent issue is whether the mistake in paragraph 5 is subject to reformation so that the contract conforms to the true intention of the parties.

II. Reformation of the Agreement.

After finding that the Agreement contained a mistake or omission, the trial court reformed paragraph 5 of the Agreement as follows:

> Should the Client contract to purchase, exchange, lease, or contract to lease with the option to buy within the carryover period to any Seller/Landlord *whose property has been introduced to the Client*, directly or indirectly, by

Broker during the term, Client agrees to pay a 4% commission as set forth above in Section 3.

(Emphasis added). As a general rule, "courts must interpret contracts as they are written, and are not at liberty to make a new contract for parties who have spoken for themselves." *Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006) (internal citations omitted). "Nevertheless, the law's strong policy favoring the enforcement of contracts as written must occasionally give way" and grant courts "the power to alter the terms of a written contract where, at the time it was executed, both parties were operating under a mutual mistake of fact or law regarding a basic assumption underlying the bargain." *Id.* (citing *Alexander v. Shapard*, 240 S.W. 287, 291-94 (Tenn. 1922)). When a court alters the provisions of a written contract, it is called "'reformation.'" *Id.* at 287 (citing *Greer v. J.T. Fargason Grocer Co.*, 77 S.W.2d 443, 443-44 (Tenn. 1935); *Tenn. Valley Iron & R.R. Co. v. Patterson*, 14 S.W.2d 726, 727 (Tenn. 1929)). We have previously explained reformation as follows:

> The basic purpose of reformation is to make the contract "conform to the real intention of the parties." *Lebo v. Green*, 221 Tenn. 301, 314, 426 S.W.2d 489, 494 (1968). It is "driven by a respect for the parties' intent and gives effect to the terms mutually agreed upon by the parties." 27 WILLISTON ON CONTRACTS § 70:2, at 210. Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by a preponderance of the evidence. Instead, the evidence of mistake must be clear and convincing. *Hazlett v. Bryant,* 192 Tenn. 251, 263, 241 S.W.2d 121, 125-26 (1951); *Tenn. Hoop Co. v. Templeton*, 151 Tenn. 375, 379-80, 270 S.W. 73, 75 (1925); *Sawyer v. Sawyer*, 106 Tenn. 597, 603, 61 S.W. 1022, 1023 (1901); *Bailey v. Bailey,* 27 Tenn. (8 Hum.) 230, 233 (1847); RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. *c,* at 410.
>
> An important subcategory of mistake is mistake in the expression, or integration, of the agreement. *Jones v. Jones*, 150 Tenn. [554,] 595, 266 S.W. [110,] 121 [(1924)]; *Alexander v. Shapard*, 146 Tenn. at 106-07, 240 S.W. at 291; RESTATEMENT (SECOND) OF CONTRACTS ch. 6 introductory note, at 379, 381, § 155 & cmt. *a,* at 406-07. A mistake in expression occurs where one or both parties to a written contract erroneously believe that the contract embodies the agreement that both parties intended it to express. In such cases, the courts may adjust the provisions of the written contract to make it express the true agreement reached by the parties. *Alexander v. Shapard*, 146 Tenn. at 107, 240 S.W. at 291; 27 WILLISTON ON CONTRACTS § 70:20, at 257.

*Id.* (footnotes omitted).

A party seeking reformation must prove the following elements by clear and convincing evidence:

"(1) the parties reached a prior agreement regarding some aspect of the bargain; (2) they intended the prior agreement to be included in the written contract; (3) the written contract materially differs from the prior agreement; and (4) the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation."

*Chandler v. Charleston Volunteer Fire Dep't*, No. W2011-00322-COA-R3-CV, 2011 WL 4026844, at \*4 (Tenn. Ct. App. Sept. 13, 2011) (quoting *Sikora*, 212 S.W.3d at 287-88). Once a party establishes these elements, "any discrepancy between the parties' prior agreement and their written contract is presumed to be the result of a mutual mistake (unless, of course, there is evidence of fraud)." *Sikora*, 212 S.W.3d at 288; *see also Chandler*, 2011 WL 4026844, at \*4. "[T]he parol evidence rule does not apply to suits for reformation of documents," *First Tenn. Bank Nat'l Ass'n v. Prime Food Servs.*, No. 03A01-9503-CH-00076, 1995 WL 309976, at \*1 (Tenn. Ct. App. May 22, 1995), because the clear and convincing evidence standard required in reformation cases acts as a safeguard, *Rentenbach Eng'g Co., Constr. Div. v. Gen. Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985). Thus, a party seeking reformation may use parol evidence "to show accident or mistake." *First Tenn. Bank*, 1995 WL 309976, at \*1.

In its response to the motion for summary judgment, Broker presented overwhelming proof that the Agreement should be reformed. First, the parties had reached a prior agreement about an aspect of the bargain. When the Church decided to sell the Bellevue Property, Broker acted as the Church's agent and received a broker's commission when that property sold. While the sale of the Bellevue Property was pending, the Church asked Broker to act as a buyer's agent and find a new property to which the Church could relocate. Initially, Broker had no concerns about receiving a commission for its services as buyer's agent because the Church requested that Broker consider properties listed for sale. Once the Church requested that Broker also consider unlisted properties, however, Broker became concerned it would not receive a commission if the Church purchased an unlisted property. Due to this concern, Broker drafted the Agreement and sent it to the Church via email explaining that the purpose of the Agreement was to ensure that Broker received a commission for assisting the Church in purchasing another property.

Second, the parties intended that the prior agreement, that Broker would receive a commission for assisting the Church in finding another property, be included in the Agreement. When Mr. Boozer drafted the Agreement, he used, as a template, language from the Seller's Agreement that had previously provided Broker with a commission. He intended to include, but left out, the phrase "whose property has been shown" after "Seller/Landlord" in paragraph 5 of the Agreement. After receiving the Agreement, Mr.

Perez sent an email to Mr. Boozer inquiring about whether Broker would still be entitled to a commission if the Church, on its own, located a property and purchased it during the exclusivity period. Mr. Boozer responded that "a 4% commission is still owed to [Broker]" even if the Church located and purchased a property on its own during the term of the Agreement. Mr. Boozer's response does not reference the carryover period mentioned in paragraph 5 of the Agreement. As the trial court found, however, Mr. Boozer's response is relevant to the issue of mistake because it "shows that the [Church] knew, understood and agreed that it was not a Seller/Landlord to whom [Broker] would introduce property but it was the [Church] to whom [Broker] would introduce the property."

Third, the Agreement materially differed from the prior agreement that Broker would receive a commission for helping the Church purchase a new property. As previously discussed, Mr. Boozer used language from the Seller's Agreement as a template, but he failed to completely change the language to that of a buyer's brokerage contract. Specifically, in paragraph 5, he failed to add the phrase "whose property has been introduced to the Client" after the term "Seller/Landlord."

Finally, the variance between the prior agreement and the Agreement was not the result of gross negligence. The mistake at issue in this case resulted from Mr. Boozer's incomplete transformation of a seller's agreement into a buyer's agreement to reflect the parties' agreement that the Church would pay a commission to Broker if Broker introduced the Church to property it ultimately purchased. Under Tennessee law, drafting errors, like the one here, resulting from "inattention" are not "categorical exemption[s]" to reformation of a contract. *Sikora*, 212 S.W.3d at 289-90. As this Court has explained:

> If inattention were enough to defeat a claim for reformation based on a mistake in expression, the remedy would almost never be available to correct typographical mistakes and scriveners errors, because parties have a duty to read the written contracts they enter into and are ordinarily charged with knowledge of their contents regardless of whether they have actually read them.

*Id.* Thus, a claim for reformation due to mistake in execution "is denied only in 'extreme cases'" where a party's mistake amounts to gross negligence. *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 157 cmt. *a*). "A party's failure to catch a drafting error when reading over a written contract does not normally rise to the level of 'gross negligence' . . . even where the party seeking reformation is the one who drafted the contract." *Id.* The record contains no evidence showing that the drafting error at issue amounted to gross negligence. Rather, the evidence shows that the drafting error occurred from an oversight when converting a seller's brokerage agreement to a buyer's brokerage agreement.

The above-cited evidence clearly and convincingly establishes a mistake in expression. We therefore conclude that the trial court did not err in reforming the Agreement to conform to the parties' intentions.

III. Breached as Reformed.

Finally, the Church argues that the trial court erred in concluding that it breached the Agreement as reformed. In determining that Broker was entitled to summary judgment, the trial court concluded that the Church breached the Agreement, as reformed, because the undisputed facts established that Broker fully performed its obligations under the Agreement by arranging for and showing the Park Avenue Property to the Church and that the Church breached the contract by not paying Broker a commission as required by the carryover provision in paragraph 5.

To succeed on a claim for breach of contract, a party must prove three elements: (1) "the existence of a valid and enforceable contract," (2) "a deficiency in the performance amounting to a breach," and (3) "damages caused by the breach." *Winters*, 354 S.W.3d at 291. Relying on paragraph 5, the Church contends that Broker failed to establish the second element. Specifically, the Church argues that the undisputed facts show that the Church's refusal to pay Broker a commission on the sale of the Park Avenue Property did not amount to a breach because Broker did not "introduce" the Church to that property due to Mr. Perez finding that property on his own prior to the Church executing the Agreement. In response, Broker asserts that, although the Church may have already been aware of the Park Avenue Property prior to executing the Agreement, Broker still "introduced" the property to the Church during the term of the Agreement because Broker "presented the property to the Church for potential purchase."

Our task, then, is to construe the term "introduced" in paragraph 5 to determine whether an introduction to property entitling Broker to a commission includes a property the Church already knew existed. "'In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.'" *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 643 (Tenn. Ct. App. 2006) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). "'Contractual terms should be given their ordinary meaning . . . and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts.'" *D & E Constr. Co., Inc. v. Robert J. Denley Co., Inc.*, 38 S.W.3d 513, 518-19 (Tenn. 2001) (quoting *Wilson v. Moore,* 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996)); *see also Lasco Inc. v. Inman Constr. Corp.*, 467 S.W.3d 467, 472 (Tenn. Ct. App. 2015). Moreover, "a contract's provisions must be interpreted in the context of the entire contract, 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another.'" *D & E Const.*, 38 S.W.3d at 519 (quoting *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999)).

The Agreement provides no definition for the term "introduced." "When a term is not defined within a contract, the court may utilize a dictionary definition of the term to gauge its meaning." *Battery Alliance Inc. v. T & L Sales Inc.*, No. W2015-00201-COA-R3-CV, 2015 WL 6873202, at *8 (Tenn. Ct. App. Nov. 9, 2015). *American Heritage Dictionary* defines "introduce" as "[t]o provide (someone) with a beginning knowledge or first experience of something," "[t]o present (a performer, for example) to the public for the first time," and "[t]o put forward (a plan for example) for consideration; propose." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, ahdictionary.com/word/search.thml?q=introduce. The third definition, "[t]o put forward . . . for consideration," is consistent with the intention of the parties and with the way in which "introduced" is used in the Agreement. The undisputed facts established that the Church asked Broker to locate a property for it to purchase after selling the Bellevue Property. The parties then entered into the Agreement to ensure that Broker received a commission if the Church purchased a property put forward by Broker for the Church's consideration during the term of the Agreement. The Agreement contains no exception providing that Broker would not be entitled to a commission if the Church purchased a property presented by Broker that the Church already knew existed. We, therefore, hold that the word "introduced," as used in the carryover provision, does not require that the Church purchase a property it was unaware of when the property was presented by Broker for a commission to be owed to Broker. Rather, it requires only that Broker present the property for the Church's consideration. As the trial court noted, "[t]o interpret the Agreement as the Church does creates a loophole that would defeat the right to a commission in every case" because simply driving around Nashville and photographing potential properties would be sufficient to deny a broker the right to a commission.

The Church had a "full and fair opportunity" to address the issues on which summary judgment was granted. *See Patton*, 242 S.W.3d at 791. The undisputed facts show that, during the term of the Agreement, Broker compiled and emailed to the Church information about the Park Avenue Property, urged the Church to consider the Park Avenue Property, and arranged for and showed the Park Avenue Property to the Church. Additionally, to solve the Church's need for additional parking, Broker suggested the solution, which the Church implemented, of using neighboring school property.[2] Based on these facts, we conclude that Broker introduced the Park Avenue Property to the Church

---

[2] During discovery, the Church asked Broker what the minimum requirement was for Broker to have introduced the Church to a property during the term of the Agreement. Broker responded, "Simply advising the [Church] of the property . . . and providing a property description and address." We are not aware of any Tennessee cases directly addressing this issue, but we believe "introduced" requires more than a broker providing a client with a property description and an address. *See Crunk v. Molina*, 1989 WL 106968, at *2-3 (Tenn. Ct. App. Sept. 18, 1989) (finding that a real estate agent had introduced the purchaser to the property when the agent showed the property to purchaser and engaged in extensive negotiations concerning the sale of the property, but finding that a different real estate agent did not introduce the property to the purchaser by simply showing the purchaser a photograph of the property).

during the term of the Agreement, entitling Broker to a four percent commission as provided in the Agreement.

In light of the foregoing, we conclude that the trial court did not err in granting summary judgment to Broker.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Spero Dei Church, for which execution may issue if necessary.

_/s/Andy D. Bennett_____
ANDY D. BENNETT, JUDGE